STATE OF NORTH CAROLINA v. ELISEO BUSTOS CARRILO

No. COA01-341

(Filed 2 April 2002)

**1. Homicide— first-degree murder—felony child abuse—motion to dismiss-sufficiency of evidence—caretaker**

The trial court did not err by denying defendant's motion to dismiss the charge of first-degree murder and by instructing the jury on the felony murder rule with child abuse as the underlying felony even though defendant contends the State failed to prove that defendant was a parent, provider of child care to the child, or supervisor of the child as required by N.C.G.S. § 14-318.4(a), because: (1) there was substantial evidence that defendant provided supervision for the minor child within the meaning of N.C.G.S. § 14-318.4(a) since defendant was living with the child's mother and the child at the time of the child's death; (2) the evil the legislature intended to suppress by the felony child abuse statute is the intentional infliction of serious injury upon a child who is dependent upon another for his care or supervision, and the minor victim was dependent upon defendant for the minor's care or supervision; and (3) contrary to defendant's assertion, the testimony from an expert witness for the State did not negate defendant's guilt.

**2. Evidence— prior crimes or bad acts—violence**

The trial court did not abuse its discretion in a first-degree murder case by admitting evidence under N.C.G.S. § 8C-1, Rule 404(b) of prior instances of violence by defendant towards the minor child victim's mother, because the evidence was offered: (1) to show why the mother did not take any action against defendant when he first began assaulting her son; (2) to identify defendant, rather than the victim's mother, as the perpetrator of the crime; and (3) to dispel defendant's contention that the injuries were accidentally inflicted.

**3. Evidence— redirect examination—defendant in this country illegally—opening door**

The trial court did not err in a first-degree murder case by permitting the State to suggest during its redirect examination of a detective that defendant was in this country illegally, because by questioning the detective on cross-examination about the

motivation which defendant might have had to give false identification to the investigating officers, defendant opened the door to the admission of explanatory or rebuttal evidence regarding other possible motivations.

### 4. Evidence— illustrative—compact disk—demonstration of baby shaking syndrome

The trial court did not abuse its discretion in a first-degree murder case by failing to exclude a compact disk presentation demonstrating the baby shaking syndrome, because: (1) the video presentation of the shaking of a doll was relevant since an expert testified that the victim in this case died as a result of brain injury due to shaken baby syndrome; (2) the compact disk presentation was used to illustrate the expert's testimony to the jury concerning the manner in which an infant is shaken in order to cause the severity of injuries sustained in the typical shaken baby syndrome case; and (3) the introduction of such evidence was not unduly prejudicial under N.C.G.S. § 8C-1, Rule 403 since the trial court limited the jury's consideration of the video to its use as illustrative evidence only.

Appeal by defendant from judgment entered 15 November 2000 by Judge Catherine C. Eagles in Forsyth County Superior Court. Heard in the Court of Appeals 24 January 2002.

*Attorney General Roy A. Cooper, III, by Special Deputy Attorney General A. Danielle Marquis, for the State.*

*Jeffrey S. Lisson for defendant-appellant.*

MARTIN, Judge.

Defendant, Eliseo Bustos Carrilo, was charged with the first degree murder of Brian Noe Gomez-Arellanes, an eight-month-old infant. A jury found him guilty and he was sentenced to life imprisonment without parole. Defendant appeals.

The State's evidence tended to show that defendant began living with Laticia Marin and her son, Brian, in February 2000. Defendant was not Brian's father. From February until 24 April 2000, the date of Brian's death, defendant, Ms. Marin, Brian, and Ms. Marin's brother, Antonio Arellanes lived in a two-bedroom apartment. Ms. Marin, defendant, and Brian slept in one room while Mr. Arellanes slept in the other.

Ms. Marin testified that on Friday, 21 April 2000, Brian started crying as she was preparing to give him a bath. Defendant hit the baby on his forehead with the fingers of his open hand three times and told him to "shut up." After arguing about defendant's treatment of the baby, according to Ms. Marin, defendant hit her on her arms and leg with an open hand and then went outside. Ms. Marin testified that this was the only time she had witnessed defendant hitting her baby.

Ms. Marin further testified that on Saturday, 22 April 2000, defendant got home at 1:00 or 1:30 a.m. with lipstick stains on his shirt. Ms. Marin was upset and defendant told her to go to bed. Defendant then took off his belt and told Ms. Marin to leave or he was going to hit her. Defendant subsequently took Ms. Marin to bed and began choking her.

On Sunday, 23 April 2000, while Ms. Marin and defendant were lying down, Brian started crying. Ms. Marin took the baby to the bed and then went to the kitchen to prepare a bottle. From the kitchen, Ms. Marin heard the baby crying even louder and so she went into the bedroom to ". . . see what had happened to him." Ms. Marin saw defendant shaking Brian and testified that "[i]t seemed like the baby's head was hitting the bed." At the same time, defendant was telling the baby to be quiet. The shaking incident occurred at about 3:00 or 4:00 p.m. Defendant then handed Ms. Marin the baby and pushed her and the baby onto the bed. Defendant subsequently left.

After defendant returned to the apartment, he received a phone call at approximately 7:00 p.m. Ms. Marin picked up another phone and listened in on the conversation. Ms. Marin became upset when she heard a woman's voice that she did not recognize. After defendant realized that Ms. Marin was listening to his conversation on the other line, he told her to hang up and Ms. Marin then threw the phone against the wall.

After the shaking incident, according to Ms. Marin, the baby cried, got quiet, then fell asleep for a while. Brian woke up later and Ms. Marin fed him. Ms. Marin laid Brian down to sleep at about 8:00 p.m. Ms. Marin testified that she awoke about 5:00 a.m. and checked on Brian, who was in bed with her and defendant. Ms. Marin noticed that Brian was coughing as if he had a cold. On Sunday morning, Ms. Marin had given Brian an over-the-counter herbal syrup called "Broncotine" for his cold. At 5:00 a.m., Ms. Marin made defendant

breakfast. While defendant was eating, Ms. Marin laid down next to Brian and sensed that he was breathing but still asleep.

Ms. Marin fell asleep from about 5:30 a.m. to 8:00 a.m. When Ms. Marin woke up at 8:00 a.m., her baby was not breathing. An ambulance was called and Brian was taken to the hospital. Attempts to revive the child failed.

About two weeks prior to Brian's death, Ms. Marin testified that she had left Brian with defendant while she went to the store. When she returned approximately ten minutes later, defendant was holding Brian, who seemed to have been crying. Defendant had blood on his hand; Brian's nose was bleeding and he had a black and blue mark on his eye.

Ms. Marin's brother, Mr. Arellanes, testified that he had never seen defendant injure Brian or Ms. Marin. Ms. Marin did not tell Mr. Arellanes that defendant had abused her until after Brian's death. Mr. Arellanes also testified that he had never hit, shaken, or hurt Brian at any time.

Defendant initially denied to investigating detective George Flowe that he had ever shaken Brian. He later admitted that he would sometimes shake Brian while playing with him. When Detective Flowe informed defendant that the force required to cause Brian's injuries could not have been caused by play, defendant stated that he had possibly shaken Brian too hard and caused Brian's injuries, but he continued to insist that he had only shaken Brian while playing with him. Thereafter, defendant admitted to the officer that he had shaken Brian in order to get him to stop crying following the altercation with Ms. Marin over the phone call.

When Ms. Marin was initially interviewed, she denied any knowledge of a shaking incident. However, on 26 April 2000, the day after defendant was arrested, Ms. Marin contacted Detective Flowe and stated, "I let him kill my baby." She also told the police that defendant had been physically abusive to her and the baby in the past.

Dr. Donald Jason, assistant professor at Wake Forest University's School of Medicine in the Department of Pathology, performed an autopsy on Brian on 25 April 2000. He found bleeding around the brain, swelling of the brain, and flattening of the brain's surface. Dr. Jason testified that there were both fresh and healing injuries. The older injuries consisted of previous bleeding that had occurred over the right side of the brain. Dr. Jason stated that these injuries had

occurred about two to three weeks prior to Brian's death while the new injuries were twelve to twenty-four hours old. The doctor also found healing fractures of the ribs at the sixth, seventh, and eighth ribs where they attached to the spine and back. Dr. Jason testified that the older injuries were consistent with a violent shaking incident. There were no bruises on the scalp to indicate a blow to the head. Dr. Jason opined that the child died due to shaken baby syndrome, a whiplash injury where the child's head is whipped back and forth from shaking, causing injury to and subsequent swelling of the brain, eventually resulting in a loss of oxygen to the brain and eventual death. During his testimony, Dr. Jason showed a computer presentation of shaken baby syndrome, illustrating what happens during such an incident.

Dr. Sara Sinal, a professor of pediatrics at Wake Forest University School of Medicine, testified that the victim had the classic autopsy findings of a shaken impact syndrome. Dr. Sinal stated that in twenty-five percent of such cases, the child dies. In addition to the victim's bleeding of the brain and healing rib fractures, Dr. Sinal also noted retinal hemorrhages in his right eye. She explained that during a violent shaking incident, layers of the retina separate such that noticeable bleeding appears on the back of the eye. According to Dr. Sinal, children who have fatal shaking injury, have immediate symptoms. These children usually become extremely ill, comatose, and often stop breathing within an hour of the shaking or instantaneously. Following a shaking incident, Dr. Sinal testified that the child may be lethargic or may go into a seizure, but a layperson may believe that the child is sleeping. The doctor further testified that even if a child was shaken at 4:00 p.m. and was in a coma by 8:00 p.m., it would be possible that the child would have been able to take a bottle at 8:00 p.m. since the suck reflex is a primitive one. However, Dr. Sinal added that the child would not have been able to wake up and act normally at 8:00 p.m.

I.

[1] Defendant first contends the trial court erred in denying defendant's motion to dismiss at the close of the evidence and in instructing the jury on felony murder. Defendant notes that his conviction of first degree murder was based upon the felony murder rule, G.S. § 14-17, with child abuse as the alleged underlying felony, G.S. § 14-318.4. Defendant argues that the State failed to prove that defendant was a parent, provider of care to the child, or supervisor of the child, an essential element of felony child abuse under G.S. § 14-318.4(a).

Therefore, defendant argues that his conviction should be reversed based on the insufficiency of the evidence.

In reviewing a motion to dismiss, this Court must determine "whether there is substantial evidence of each essential element of the offense charged, or of a lesser offense included therein, and of the defendant's being the perpetrator of such offense." *State v. Bates*, 313 N.C. 580, 581, 330 S.E.2d 200, 201 (1985). Substantial evidence has been defined as "that amount of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Porter*, 303 N.C. 680, 685, 281 S.E.2d 377, 381 (1981). Further, the evidence should be considered in the light most favorable to the State and the State is entitled to every reasonable inference to be drawn therefrom. *Bates*, 313 N.C. at 581, 330 S.E.2d at 201. Any contradictions or discrepancies in the evidence are for resolution by the jury and do not warrant dismissal. *State v. Powell*, 299 N.C. 95, 261 S.E.2d 114 (1980).

Defendant contends the State failed to prove that he was Brian's parent, provider of care, or supervisor since the evidence shows that he did not act *in loco parentis*, such as daycare operators, foster parents, babysitters, and those who take on the responsibility to see after a child. We disagree.

The felony child abuse statute relevant to this case provides:

> *A parent or any other person providing care to or supervision of a child* less than 16 years of age who intentionally inflicts any serious physical injury upon or to the child or who intentionally commits an assault upon the child which results in any serious physical injury to the child is guilty of a Class E felony, except as otherwise provided in subsection (a3) of this section.

N.C. Gen. Stat. § 14-318.4(a) (1999) (emphasis added). The appellate courts of this State have never precisely addressed the question of who may constitute a parent, provider of care, or supervisor of a child under this statute. While a criminal statute must be strictly construed against the State, the intent of the legislature controls the interpretation of statutes, and such statutes must be construed "with regard to the evil which it is intended to suppress." *State v. Tew*, 326 N.C. 732, 739, 392 S.E.2d 603, 607 (1990). Legislative intent may be determined by reviewing the "legislative history of an act and the circumstances surrounding its adoption, earlier statutes on the same

subject, the common law as it was understood at the time of the enactment of the statute, and previous interpretations of the same or similar statutes." *In re Banks*, 295 N.C. 236, 239-40, 244 S.E.2d 386, 389 (1978) (citations omitted).

Applying these principles to the felony child abuse statute at issue, G.S. § 14-318.4(a), we conclude there was substantial evidence that defendant provided supervision for Brian within the meaning of the statute. Felony child abuse has been defined by the North Carolina Supreme Court as "the intentional infliction of serious injuries by a *caretaker* to a child." *State v. Phillips*, 328 N.C. 1, 20, 399 S.E.2d 293, 302 (emphasis added), *cert. denied*, 501 U.S. 1208, 115 L. Ed. 2d 977 (1991). We find guidance in our State's juvenile code; the definition of "caretaker" found in the juvenile code subchapter pertaining to abuse and neglect includes "an adult member of the juvenile's household." N. C. Gen. Stat. § 7B-101(3) (1999). Defendant would fall under this definition since he was living with Ms. Marin and Brian at the time of Brian's death.

Additionally, the evil that the legislature intended to suppress by the felony child abuse statute is clearly the intentional infliction of serious injury upon a child who is dependent upon another for his or her care or supervision. The evidence in this case was sufficient to establish that Brian was dependent upon defendant for his care or supervision. The State's evidence showed that defendant had resided with Brian's mother for two months prior to the murder, that Brian and Brian's mother shared the same bedroom with defendant, and that Brian's mother had left Brian in defendant's care for short periods of time. On the day defendant allegedly inflicted the fatal injury upon the child, Brian was left in defendant's care while his mother went to the kitchen to prepare a bottle. Defendant admitted picking Brian up and shaking him, in an effort to get the child to stop crying, immediately after an altercation had occurred between defendant and Brian's mother. There was evidence that, on another occasion, Ms. Marin had left Brian in defendant's care while she went to the store. Considered in the light most favorable to the State, there was substantial evidence that defendant "provid[ed] care to or supervision of" Brian within the meaning of the felony child abuse statute.

Defendant also contends the State failed to offer substantial evidence of his guilt because the testimony of the State's expert witness, Dr. Sinal, shows that defendant could not be guilty. Ms. Marin testi-

fied that Brian took a bottle between 7:00 p.m. and 8:00 p.m.; Dr. Sinal testified that if the child was shaken at 4:00 p.m., he would have had immediate symptoms and would have been in a coma shortly thereafter. However, Dr. Sinal also testified that even if Brian had been shaken at 4:00 p.m. and had gone into a coma as a result, it would still be possible that he would have been able to take a bottle at 8:00 p.m. because the suck reflex is a primitive one. Dr. Sinal's testimony, therefore, does not negate defendant's guilt. The trial court properly denied defendant's motion to dismiss and his assignment of error to the contrary is overruled.

II.

A.

**[2]** Defendant next contends the trial court erred in admitting evidence of prior instances of violence on defendant's part directed toward Ms. Marin. He argues the evidence showed only defendant's bad character and propensity to commit violent acts and, therefore, was not admissible by reason of G.S. § 8C-1, Rule 404(b). We disagree.

Rule 404(b) provides for the exclusion of evidence of other crimes, wrongs, or acts if the sole purpose of the evidence is to show a person's bad character in order to prove that his conduct on a particular occasion was consistent with that bad character. However, evidence of other crimes, wrongs, or acts is admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C. Gen. Stat. § 8C-1, Rule 404(b). The Supreme Court has made it clear that Rule 404(b) is a rule of

> *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.

*State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). Therefore, as long as evidence of other crimes, wrongs, or acts is relevant to any other fact or issue other than the defendant's propensity to commit the crime for which he is being tried, the evidence is admissible. *State v. Bagley*, 321 N.C. 201, 362 S.E.2d 244 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988). However, even relevant evidence may be excluded if its prejudicial impact outweighs its pro-

bative value. N.C. Gen. Stat. § 8C-1, Rule 403 (1999). "Whether to exclude evidence of other crimes or bad acts is a matter within the sound discretion of the trial court." *State v. Woolridge*, 147 N.C. App. 685, 692, 557 S.E.2d 158, 162 (2001). A trial court will be held to have abused its discretion only "upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." *State v. Riddick*, 315 N.C. 749, 756, 340 S.E.2d 55, 59 (1986).

In the present case, the assaults on Ms. Marin were offered into evidence to show why the mother did not take any action against defendant when he first began assaulting her son; to identify defendant, rather than Ms. Marin, as the perpetrator; and to dispel defendant's contention that the injuries were accidentally inflicted. Because the evidence of prior acts of domestic violence toward Ms. Marin was offered for a purpose other than to show the propensity of defendant to commit the crime for which he was being tried, the trial court did not abuse its discretion in admitting this evidence.

## B.

**[3]** Defendant also argues that the trial court erred by permitting the State to suggest, in its examination of Detective Flowe, that defendant was in this country illegally. The assignment of error arises from the following examination of Detective Flowe, which occurred after Detective Flowe had testified that defendant had given a false name when he was initially arrested:

Q: And you say it didn't surprise you because he was illegal, right?

MR. BEDSWORTH: Objection and move to strike.

THE COURT: Overruled.

Q: Is that right?

A: I don't know if he was illegal; but didn't surprise me that he used a different name.

Q: Well, is that the general habit of someone who is not legally in this country?

MR. BEDSWORTH: Objection and move to strike.

THE COURT: Denied.

A: That is correct.

**STATE v. CARRILO**

[149 N.C. App. 543 (2002)]

Defendant contends the only purpose of this examination was to establish that defendant was a person of bad character. We disagree.

During his cross-examination of Detective Flowe, defendant's counsel asked whether the officer knew that a number of persons in the Mexican community used false names for the purpose of obtaining employment; Detective Flowe acknowledged that was correct. In questioning Detective Flowe about the motivation which defendant might have had to give false identification to the investigating officers, defendant opened the door to the admission of explanatory or rebuttal evidence regarding other possible motivations. Our Supreme Court has stated:

> [T]he law wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself. Where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially.

*State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981). The rule applies even where a defendant solicits evidence during cross-examination of a State's witness, prompting the State to introduce otherwise inadmissible evidence in rebuttal. *State v. McKinnon*, 328 N.C. 668, 403 S.E.2d 474 (1991). Therefore, the trial court did not err in allowing the State's questions on redirect examination regarding defendant's possible motivation for giving a false identification.

III.

[4] Finally, defendant contends the trial court should have excluded a compact disk presentation entitled "The Mechanism of Baby Shaking Syndrome," which included (1) a stop-action video demonstration of the shaking of a doll, representing an infant, and (2) animated diagrams of the infant brain. We disagree.

Admission of relevant evidence is a matter left to the sound discretion of the trial court and will not be reversed except upon a showing of abuse of discretion. *State v. Golphin*, 352 N.C. 364, 533 S.E.2d 168 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). The test for admissibility of a demonstration is whether, if relevant, the probative value of the evidence ". . . is substantially out-

weighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. . . ." N.C. Gen. Stat. § 8C-1, Rule 403 (1999); *see also Id.*

The video presentation of the shaking of a doll was relevant since Dr. Jason, an expert in the field of forensic pathology, opined that the victim in this case died as a result of brain injury due to shaken baby syndrome, a whiplash injury where the child's head is whipped back and forth by shaking. The compact disk presentation was used to illustrate Dr. Jason's testimony to the jury concerning the manner in which an infant is shaken in order to cause the severity of injuries sustained in the typical shaken baby syndrome case.

Moreover, the introduction of such evidence was not unduly prejudicial. The trial court limited the jury's consideration of the video to its use as illustrative evidence only. It was made clear to the jury that the video was not of the victim being shaken but only a depiction of the mechanism by which shaken baby syndrome occurs, using a doll to simulate an infant. This assignment of error is overruled.

Defendant received a fair trial, free of prejudicial error.

No error.

Judges TIMMONS-GOODSON and BRYANT concur.