STATE v. PERRY

[229 N.C. App. 304 (2013)]

─────────────

STATE OF NORTH CAROLINA
v.
JOHNATHAN BLAKE PERRY

No. COA13-30

Filed 20 August 2013

1. **Evidence—expert testimony—cause of injuries—current state of medical research**

    The trial court did not commit plain error in a first-degree murder case by allowing the admission of testimony from the State's experts regarding the cause of the minor child's injuries. Although defendant contended that "the current state of medical research" in the diagnosis of head injuries in children rendered the testimony of the State's witnesses unreliable, the validity of this claim could not be evaluated based on the absence of record evidence.

2. **Homicide—first-degree murder—motion to dismiss—sufficiency of evidence—intentional assault of child—hands used as deadly weapons**

    The trial court did not err by denying defendant's motion to dismiss the charge of first-degree murder. The record contained sufficient evidence to allow the jury to find that defendant had intentionally assaulted the minor child while using his hands as deadly weapons and that the child sustained fatal injuries as a result of this assault.

**3. Homicide—first-degree murder—felony murder rule—underlying felony—felony child abuse**

   Although defendant argued that felony child abuse was not a viable underlying felony sufficient to support a conviction for first-degree murder under the felony murder rule, defendant acknowledged that this issue has already been decided adversely to his position by the Court of Appeals.

**4. Sentencing—life imprisonment without parole—first-degree murder—not cruel and unusual punishment**

   The trial court did not violate defendant's right to be free from cruel and unusual punishment by sentencing him to life imprisonment without the possibility of parole for the crime of first-degree murder. The imposed sentence was authorized by the relevant statutory provisions, and thus, could not be classified as cruel and unusual in a constitutional sense.

   Appeal by defendant from judgment entered 5 June 2012 by Judge Michael J. O'Foghludha in Wake County Superior Court. Heard in the Court of Appeals 22 May 2013.

   *Attorney General Roy Cooper, by Assistant Attorney General Nicholaos G. Vlahos, for the State.*

   *Kathryn L. VandenBerg for Defendant-appellant.*

   ERVIN, Judge.

   Defendant Johnathan Blake Perry appeals from a judgment sentencing him to a term of life imprisonment without the possibility of parole based upon his conviction for first degree murder. On appeal, Defendant argues that the trial court committed plain error by allowing the State's expert witnesses to express opinions to the effect that the injuries sustained by the alleged victim, J.W.,[1] had been intentionally inflicted on the grounds that this testimony was "not sufficiently reliable"; that the trial court erred by denying his motion to dismiss the charge against him for lack of adequate evidentiary support; that his felony murder conviction cannot be properly predicated on his commission of felonious child abuse inflicting serious bodily injury; and that his conviction of first degree murder and resulting sentence of life imprisonment without possibility

---

   1. J.W. will be referred to throughout the remainder of this opinion as Joan, a pseudonym used to protect the child's privacy and for ease of reading.

of parole are disproportionate and constitute cruel and unusual punishment. After careful consideration of Defendant's challenges to the trial court's judgment in light of the record and the applicable law, we conclude that the trial court's judgment should remain undisturbed.

## I. Factual Background

### A. Substantive Facts

#### 1. State's Evidence

##### a. Events of 7 December 2010

Joan was born on 29 September 2009 to Sebrina Wright, who had three other children. Although Defendant was Joan's father, he was not the father of any of her siblings. Defendant and Ms. Wright had little contact during the time that Ms. Wright was pregnant with Joan or the first year of Joan's life. However, Defendant moved in with Ms. Wright and her four children in September 2010.

Joan was a healthy baby who developed normally and did not have significant medical problems. Yolanda Manson, Ms. Wright's sister, recalled Joan as a happy, outgoing baby, who drank from a cup and could pick herself up if she fell. Joan did not take any medications, had no problems eating, and was not known to choke on food or milk.

Joan continued to appear happy and healthy during the first week of December 2010. On Monday, 6 December 2010, Joan behaved normally, smiling at family members and eating well. At that time, Joan was starting to use a drinking cup; however, she also used a bottle, which she was able to hold on her own.

Although Joan initially appeared to be comfortable with Defendant, as time went on, Ms. Wright "started to notice [that] she would scream a lot . . . when he would have her" and that "he was the only male that she really didn't favor." According to Ms. Wright, Defendant "always thought [Joan] was real clingy to [Ms. Wright]" and "just didn't like the fact that she was so clingy[.]" When Joan was approximately six months old, Ms. Wright returned to work. At that point, Ms. Wright's mother began watching Joan during the work day. After Defendant moved in, Ms. Wright's mother continued to watch Joan on most days. However, Defendant watched Joan once or twice on a "rare occasion."

At about 5:30 a.m. on Tuesday, 7 December 2010, Ms. Wright got up, changed Joan's diaper, and gave her a bottle of milk, which Joan drank normally. Ms. Wright did not see any bruising on Joan's legs or body at that time. Before she left for work, Ms. Wright woke Defendant,

who was sleeping in the living room. Upon being awakened, Defendant moved into the bedroom where Joan was sleeping. At approximately 6:30 a.m., Ms. Wright departed with the three older children, leaving Defendant and Joan alone in the house.

Ms. Wright spoke briefly with Defendant on the phone at approximately 11:30 a.m. on 7 December 2010. When Defendant held Joan up to the phone, Ms. Wright could hear her "little baby talk" and recalled that she "just sounded normal." When Ms. Wright hung up in order to enter a bank branch, Defendant asked her to call back as soon as she emerged from the bank building. After depositing a check and leaving the bank, Ms. Wright called Defendant twice without receiving any answer. At the time of her third call, Defendant answered and told Ms. Wright that Joan was not breathing and was "gone." Ms. Wright told Defendant to call 911, hung up, and drove home immediately, calling 911 herself as she drove.

About five minutes after speaking with Defendant, Ms. Wright arrived at her home. At that time, she saw emergency medical services personnel carrying Joan, who was not moving and whose eyes were rolled back into her head, to an ambulance for transportation to Wake Medical Center. At the time that they attempted to render assistance to Joan, emergency medical personnel noted that she was unresponsive, not moving or breathing on her own, had no discernible pulse, and felt "very limp" and "like a rag doll." After emergency medical services personnel moved Joan's tongue, she resumed an inadequate labored breathing. However, she did not open her eyes or respond to stimuli. In the ambulance, Joan was unresponsive, was only breathing about four times a minute, vomited a thin white fluid, and never regained consciousness. In the course of treating the child, emergency medical services personnel determined that Joan's blood sugar was normal, that her airway was not obstructed, that she was not on any sort of medication, that she did not have a fever or a history of seizures, and that she had not had any access to cleaning products or illegal drugs.

According to Ms. Wright, Defendant was "running back and forth" "arguing" and "fussing" "with the ambulance people." As a result, Captain Tony Pack of the Wake County Emergency Medical Services called upon police to restrain Defendant. When emergency workers asked Defendant what had happened, he said that he had given Joan a bottle, departed from the room while leaving Joan on the couch, and returned about eight minutes later to find her on the floor "gargling," unresponsive, and not breathing. According to investigating officers, the carpeted floor upon which Defendant claimed that Joan had fallen was 18 inches below the couch seat and 24 inches below the couch arm.

At the hospital, Joan began "posturing," which is "a term for stiffening of the extremities," a development that indicated that the "[s]welling in the brain [had] reached a point that it's actually beginning to force the brain out of . . . the hole at the base of the skull." According to Vernon Hilliard, Jr., of the Eastern Wake County Emergency Medical Services, these symptoms generally occur "almost immediately before death due to head trauma." After receiving initial treatment at Wake Medical Center, Joan was airlifted to the University of North Carolina Medical Center at around 4:00 p.m. on 7 December 2010.

As they travelled between the two medical facilities, Ms. Wright asked Defendant "What did you do?" Defendant did not answer Ms. Wright's question. When investigating officers arrived at the University of North Carolina Medical Center, Defendant walked away. An hour or two later, Ms. Wright reiterated her question to Defendant, who, once again, failed to answer. However, Defendant did tell Melissa Williams of the Wake County Department of Human Services that he had put Joan on a sofa with a bottle; that, when he returned to the living room eight or ten minutes later, she was lying on the floor choking and with her eyes closed; that Ms. Wright had directed him to call 911 when she called and that he had not harmed Joan. Defendant later talked to investigating officers.

At the University of North Carolina Medical Center, attending physicians drilled a small hole in Joan's forehead for the purpose of installing an intracranial pressure monitor and administered medications in an attempt to reduce the pressure resulting from the swelling in her brain. Unfortunately, these medical interventions could not reverse the damage caused by Joan's injuries. As a result, Joan was pronounced dead in the early morning hours of 9 December 2010.

#### b.  State's Expert Testimony

Dr. Molly Berkoff, the medical director of the child protection team at the University of North Carolina Medical Center, came to the hospital on 7 December 2010. According to Dr. Berkoff, the most common injuries seen in children who have experienced abusive head injury, which is a term used to describe injuries to a child's head or brain that appear to have been intentional rather than accidental in origin, were "intracranial hemorrhages" and "subdural hemorrhages, bleeding inside the brain, [] retinal hemorrhages or bleeding inside the eye, [and] subarachnoid edema or swelling inside the brain." Abusive head trauma is "thought to be related to the child's brain being moved in a rotational way, not in one linear kind of direct manner but, instead, potentially as a result of shaking." As a result, the injuries typically associated with abusive head

trauma differ from those that tend to be sustained in a simple linear fall. In Dr. Berkoff's opinion, "having a child die as a result of a simple fall would be an extremely rare occurrence" affecting "less than .5 per million children."

After arriving at the hospital, Dr. Berkoff consulted with the intensive care physicians, examined Joan briefly, and met with Defendant and Ms. Wright, who provided a history of the circumstances surrounding Joan's injury that was consistent with the other evidence presented at trial. During a second, more thorough, physical exam, Dr. Berkoff noted the presence of bruises and scratches on Joan's body, including bruises on Joan's thighs and abdomen which, according to Dr. Berkoff, were "not [in] a typical location for a bruise in a toddler," and "unusual" marks and bruises on Joan's buttocks. In Dr. Berkoff's opinion, the bruising that she observed constituted "further supporting evidence of trauma." CAT scans of Joan's head "showed a subdural hematoma in her brain as well as significant swelling of her brain, cerebral edema." According to Dr. Berkoff:

> [T]he most significant thing on these scans for [Joan] was the amount of cerebral edema that she had, and . . . [the] subdural bleeding there as well. . . . I've come to the conclusion they weren't from accidental means, for example, a simple fall. It was in a different location as well as being more extensive than what I typically see in cases where children have simple falls.

Finally, Dr. Berkoff observed that Joan "had extensive retinal hemorrhages in both eyes," which Dr. Berkoff considered to be "more supporting evidence for her being diagnosed with abusive head trauma."

In Dr. Berkoff's opinion, the "location of where [Joan's] subdural was and the lack of a significant history of trauma for her made me conclude that her subdural [bleeding] was most likely a result of abusive head trauma in addition to the other findings that were identified from her clinical evaluation and her radiologic evaluation." Dr. Berkoff's opinion rested, in part, on the fact that the size and location of the bleeding in Joan's brain, in addition to the extensive swelling of Joan's brain, was not consistent with known cases involving simple falls. In reaching this conclusion, Dr. Berkoff noted that Joan had "not only had this subdural which was concerning, but she also had massive cerebral edema" in which "her whole brain looked swollen." Moreover, the fact that Joan "had extensive retinal hemorrhages in both eyes" provided "more supporting evidence for her being diagnosed with abusive head trauma."

Finally, Dr. Berkoff noted that Joan's injuries "seemed to have developed over a very short period of time[.]" In Dr. Berkoff's opinion, Joan's injuries occurred after Ms. Wright heard her speaking normally at around 11:30 a.m., a conclusion which she reached based upon the "rapid onset" of symptoms resulting from abusive head trauma, and might have been caused by "potentially either shaking or having a child's head strike an object or an object strike a child's head[.]" As a result, after "[r]eviewing [Joan's] lab results, the different blood tests that [Joan] had done, looking at her radiologic results, her X-rays, and the CT scans of her head that she had completed, [and] discussing the case with the other medical subspecialists and the treating team in the intensive care unit" and considering the presence of "extensive bilateral retinal hemorrhages in multiple layers of the retinae in her eyes," "significant cerebral edema or swelling," and "a subdural hemorrhage or hematoma in her brain" and the fact that there "was no evidence of any significant abnormalities that could explain" these injuries, Dr. Berkoff concluded that Joan's injuries were caused by "physical abuse, child physical abuse, with abusive head trauma."

Dr. Berkoff rejected Defendant's claim that Joan had been injured in a fall for a number of reasons. Among other things, when a child is injured in a simple accidental fall, Dr. Berkoff would generally "expect to see a very small collection of blood, a really tiny amount of blood in that child's brain." Although Dr. Berkoff had observed "subdural hemorrhages or hematomas in children [who] have had accidental trauma," the "types of subdural hematomas or hemorrhages [generally found in such instances] are different in appearance from those [characteristic of] abusive head trauma" in that they are "smaller" and "usually confined to a particular location." Similarly, retinal bleeding from natural causes is limited to "small, very scattered few retinal hemorrhages in isolated layers of the retina from birth trauma" and in children with certain illnesses. On the other hand, "extensive retinal hemorrhages in all areas of the retina, having multiple retinal hemorrhages of the eye in all areas of the retina" "is something that you don't see from a simple fall in an otherwise healthy child." As a result, although Dr. Berkoff acknowledged on cross-examination that subdural hematomas, cerebral edemas, and retinal hemorrhages could result from an accidental injury, she did not believe that such an accident had occurred in this instance.

Dr. Jonathan Privette, an associate chief medical examiner for the State of North Carolina, performed an autopsy on Joan's body. During that procedure, Dr. Privette observed small blunt force injuries to Joan's forehead and lip, bruises on both of Joan's hips, and a recently inflicted blunt force injury to Joan's ribs that was not consistent with the

administration of CPR. After completing an external examination, Dr. Privette examined Joan's brain tissue and identified the injury caused by the insertion of the intracranial pressure monitor. In addition, Dr. Privette found at least six other areas of subdural bruising or bleeding that were not consistent with the medical treatment that Joan had received. Dr. Privette determined that Joan had sustained "blunt force [head] injuries" that caused "impact or pressure significant enough to damage the tissue and cause blood to leak out into the soft tissues," with the various bruises being "separate from one another, indicating that" they were caused by separate applications of impact or pressure to Joan's skull. An examination of the brain tissue in the back of Joan's head revealed the presence of additional hematomas, including at least one that was "so deep" that "the severity of the hemorrhage" led Dr. Privette to conclude that it resulted from impact rather than mere pressure. In addition, Dr. Privette found a large quantity of blood and a degree of swelling in Joan's brain indicative of a "significant injury." According to Dr. Privette, the degree of swelling and injury that he saw in Joan's brain was equivalent to the degree of trauma that was typically associated with injuries sustained in motor vehicle collisions. In Dr. Privette's opinion, Joan's injuries were inconsistent with those that he would expect to occur during a simple fall from a height of two feet. Based upon his autopsy findings, Dr. Privette concluded that "the cause of [Joan's] injuries and subsequent death" was "nonaccidental head injury" or a "constellation of injuries" not "caused by an accident" which were "most likely inflicted." Although Dr. Privette acknowledged on cross-examination that accidental injuries can also cause cranial bruising, subdural hematomas, and swelling, he stated on redirect that, "[i]n [his] opinion, a fall from a love seat onto a carpeted floor didn't cause these injuries or this constellation of injuries" and that Joan's injuries might have resulted from blows by a human hand.

Dr. Thomas Bouldin, a professor of pathology at the University of North Carolina medical school, reviewed Dr. Privette's autopsy report and conducted his own examination of Joan's eyes and brain. Dr. Bouldin observed recent subdural bleeding, which is typically caused by the rupture of blood vessels, and swelling of the brain, both of which are typically indicative of trauma to the brain. A microscopic examination of the tissues in both of Joan's eyes revealed the presence of multiple retinal hemorrhages that "were not superficial hemorrhages but involve[d] multiple layers of the retina." In Dr. Bouldin's opinion, "the combination of an acute subdural hematoma and the presence of retinal hemorrhages in a dead child" in the absence of an alternative medical explanation for the child's death "always raises very strongly the possibility of inflicted

head injury." As was the case with Dr. Berkoff and Dr. Privette, Dr. Bouldin agreed that any one of the types of injuries that he observed during his examination might, considered in isolation, be accidental in origin. However, on redirect examination, Dr. Bouldin reiterated that the existence of a constellation of unexplained brain swelling, subdural hematoma, and retinal hemorrhages caused him to conclude that Joan's injuries were, most likely, intentionally inflicted.

## 2. Defendant's Evidence

Dr. Donald Jason, an associate professor in the Department of Pathology at Wake Forest University School of Medicine, examined the medical and investigative reports relating to Joan's injuries. In Dr. Jason's opinion, Defendant's account of the events surrounding Joan's injuries was consistent with the possibility that Joan had fallen off the couch and landed on the back of her head, sustaining "a concussion with consequent loss of [her] gag reflex," losing consciousness as the result of inhaling milk, and, for that reason, being unable to deliver oxygen to her brain for eight to ten minutes. Dr. Jason opined that the injuries to the back of Joan's head might have been caused by a short fall and that the bruises on her body were relatively minor and consistent with Joan's status as a toddler. In addition, Dr. Jason denied that retinal hemorrhages indicated that child abuse had occurred and opined that Joan's subdural hematoma was "easily explainable" as resulting from the intracranial pressure monitor. Dr. Jason testified that the combination of subdural hemorrhage, subgaleal hemorrhage, and retinal hemorrhage was "not necessarily" indicative of abuse because Joan's injuries "could have" occurred accidentally. In his experience, child abuse often resulted in skull and rib fractures, neither of which were present in this instance. Finally, Dr. Jason told the jury that the diagnosis of "shaken baby syndrome" was "controversial" and sometimes inaccurate and that none of Joan's injuries were "suspicious of being intentional under the circumstances." On cross-examination, Dr. Jason acknowledged that Dr. Berkoff's notes indicated the presence of cerebral edema and subdural bleeding prior to the installation of an intracranial pressure bolt and conceded that the relevant medical literature indicated that fatal injuries rarely resulted from a short fall.

## B. Procedural History

Warrants charging Defendant with felonious child abuse inflicting serious bodily injury and first degree murder were issued on 9 December and 10 December 2010, respectively. On 4 January 2011, the Wake County grand jury returned bills of indictment charging Defendant

with first degree murder and felonious child abuse inflicting serious bodily injury. The charges against Defendant came on for trial before the trial court and a jury at the 29 May 2012 Criminal Session of Wake County Superior Court. On 4 June 2012, the jury returned verdicts finding Defendant guilty of first degree murder on the basis of the felony murder rule, with felonious child abuse inflicting serious bodily injury as the predicate felony, and felonious child abuse inflicting serious bodily injury. After arresting judgment in connection with Defendant's conviction for felonious child abuse inflicting serious bodily injury, the trial court entered a judgment sentencing Defendant to a term of life imprisonment without the possibility of parole based upon his conviction for first degree murder. Defendant noted an appeal to this Court from the trial court's judgment.

## II.  Substantive Legal Analysis

### A.  Admissibility of Expert Testimony

**[1]** In his first challenge to the trial court's judgment, Defendant argues that the trial court committed plain error by allowing the admission of "unreliable and inaccurate testimony from the State's experts regarding the cause of [Joan's] injuries." More specifically, Defendant contends that the trial court should have precluded the admission of the testimony of Dr. Berkoff, Dr. Bouldin, and Dr. Privette "because it was not sufficiently reliable" given recent developments in "[c]urrent medical science" and that the trial court's failure to do so severely prejudiced him. We do not find this argument persuasive.

"When, as in this case, a defendant fails to object to the admission of the testimony at trial, we review only for plain error." *State v. Moore,* 366 N.C. 100, 105-06, 726 S.E.2d 168, 173 (2012) (citing N.C. R. App. P. 10(a) (4) (stating that, "[i]n criminal cases, an issue that was not preserved by objection . . . may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error"); *State v. Lawrence,* 365 N.C. 506, 516, 723 S.E.2d 326, 333 (2012) (internal citation omitted); and *State v. Odom,* 307 N.C. 655, 659-60, 300 S.E.2d 375, 378 (1983)). The plain error rule:

> is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where [the error] is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of

justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings or where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.

*Moore*, 366 N.C. at 106, 726 S.E.2d at 173 (quoting *Odom*, 307 N.C. at 660, 300 S.E.2d at 378 (internal quotation marks omitted) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982) (footnotes omitted), *cert. denied*, 459 U.S. 1018, 103 S. Ct. 381, 74 L. Ed. 2d 513 (1982)). In order for an unpreserved evidentiary error to constitute plain error, the defendant must meet the burden of showing that, "after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty.' " *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334 (quoting *Odom* at 660, 300 S.E.2d at 378, and citing *State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986)). We will now apply this standard to evaluate the validity of Defendant's argument.

The admission of expert testimony is governed by N.C. Gen. Stat. § 8C-1, Rule 702, which provides, in pertinent part, that:

> (a)  If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
>
> > (1)  The testimony is based upon sufficient facts or data.
> >
> > (2)  The testimony is the product of reliable principles and methods.
> >
> > (3)  The witness has applied the principles and methods reliably to the facts of the case.

Although Defendant has not argued that any of the State's expert witnesses were not qualified to present expert testimony or that their testimony was based on insufficient data, he does argue that certain opinions presented by the State's experts were "unreliable given the current state of medical research[.]" Thus, Defendant's argument focuses on the proper application of N.C. Gen. Stat. § 8C-1, Rules 702(a)(2) and 702(a)(3).

Although their specific areas of expertise varied, all three of the State's expert witnesses testified that their review of the pertinent

medical records and other available information indicated that Joan's external bruises, retinal bleeding, and intracranial bleeding and swelling were consistent with previously observed cases involving intentionally inflicted injuries and were inconsistent with previously observed cases involving accidentally inflicted injuries, such as a simple fall as suggested in Defendant's statements.

For example, Dr. Berkoff observed bruises and scratches on Joan's body, including unusual marks and bruises on her buttocks that were not in "a typical location" for bruises resulting from a toddler's fall. In addition, the extent and location of bleeding in Joan's brain, coupled with the extensive swelling of her brain, was not consistent with cases in which a child was known to have been injured as the result of a simple fall. Furthermore, Dr. Berkoff testified that the "pattern of the subdural bleeding did not look like that in children that [she had] assessed" after a simple fall. In Dr. Berkoff's experience, "having a child die as a result of a simple fall would be an extremely rare occurrence." As a result, in light of the unusual bruising on Joan's body; the fact that she had unexplained "extensive bilateral retinal hemorrhages in multiple layers of the retinae in her eyes," "significant cerebral edema or swelling," and "a subdural hemorrhage or hematoma in her brain;" and the fact that Joan's injuries would be extremely unlikely to have resulted from a simple fall from a couch, Dr. Berkoff was of the opinion, to a reasonable degree of medical certainty, that Joan's injuries and death were caused by "child physical abuse, with abusive head trauma."

Similarly, Dr. Privette testified that he observed a recently inflicted blunt force injury to Joan's ribs that was not located at a place where CPR-related bruising tends to occur. Dr. Privette also determined that Joan had sustained a number of individual and separate "blunt force injuries" that resulted in "impact or pressure significant enough to damage the tissue and cause blood to leak out into the soft tissues." The extent of the cerebral bleeding that he observed, separate from that associated with the intracranial pressure bolt, including at least one very deep hematoma, led Dr. Privette to conclude that this cerebral bleeding stemmed from an impact in which Joan's "head either struck something or something struck [her] head" rather than from mere pressure. In Dr. Privette's opinion, the type and degree of Joan's injuries were not typical of those generally seen as the result of a fall from a height of less than five feet. Instead, the degree of swelling and brain injury that Joan exhibited was similar to that seen in those injured in automobile collisions. Based upon his examination and findings, Dr. Privette testified that "the cause of [Joan's] injuries and subsequent death" was "nonaccidental head

injury" or a "constellation of injuries" that were "most likely inflicted" rather than "caused by an accident."

Finally, Dr. Bouldin observed that Joan had multiple retinal hemorrhages that "were not superficial hemorrhages but involve[d] multiple layers of the retina." As a result, Dr. Bouldin opined that "the combination of an acute subdural hematoma and the presence of retinal hemorrhages in a dead child" given the absence of any other medical explanation for the child's death "always raises very strongly the possibility of inflicted head injury." Thus, the common thread in the State's expert testimony was that it would be highly unusual for a child to suffer serious injury or death as the result of a fall of approximately two feet from a sofa onto a carpeted floor; that, at the time of her death, Joan had sustained extensive and profound damage to her brain; that the nature and degree of her injuries was comparable to the sorts of serious trauma seen in a motor vehicle accident; and that, based upon the type, location, and severity of her injuries coupled with the absence of any alternative explanation for the nature and extent of those injuries, Joan's death most likely resulted from an intentionally inflicted injury.

According to Defendant, the opinions of the State's experts "concluding that [Joan's] injuries were intentionally inflicted" rested "on previously accepted medical science that is now in doubt" and that, because "[c]urrent medical science has cast significant doubt" on previously accepted theories regarding the possible causes of brain injuries in children, there is currently "no medical certainty around these topics." Based upon that set of assertions, Defendant contends that "medical experts should be precluded" from offering testimony such as that allowed by the trial court in this case.

The fundamental deficiency in Defendant's argument is that it rests upon information that is not contained in the record developed before the trial court. " 'The appellate courts can judicially know only what appears of record.' 'This Court's review on appeal is limited to what is in the record or in the designated verbatim transcript of proceedings.' " *State v. Price*, 344 N.C. 583, 593, 476 S.E.2d 317, 323 (1996) (quoting *Jackson v. Housing Authority of High Point*, 321 N.C. 584, 586, 364 S.E.2d 416, 417 (1988), and *State v. Moore*, 75 N.C. App. 543, 548, 331 S.E.2d 251, 254, *disc. rev. denied*, 315 N.C. 188, 337 S.E.2d 862 (1985) (internal citation omitted)). "In making our review and reaching our determination upon the facts of a particular case, we can judicially know only what appears of record on appeal and will not speculate as to matters outside the record." *State v. Branch*, 306 N.C. 101, 105, 291 S.E.2d 653, 657 (1982) (citing *Tomlins v. Cranford*, 227 N.C. 323, 42 S.E. 2d 100 (1947)).

The record developed at trial contains no information concerning the state of "current medical science" or the degree to which "significant doubt" has arisen with respect to the manner in which brain injuries in young children occur. In his brief, Defendant supports his argument with citations to a recent dissenting opinion in which Justice Ginsberg expressed doubts about shaken baby syndrome and to a 2009 law review article, neither of which rest upon evidence presented to the trial court and neither of which are binding upon this Court. Although Defendant contends that "the current state of medical research" in the diagnosis of head injuries in children rendered the testimony of the State's witnesses "unreliable," we cannot evaluate the validity of this claim in the absence of record evidence establishing what the current state of medical research into the subject of childhood head injuries actually is. While Defendant is correct in reminding us that, when a trial court is "presented with 'compelling new perspectives on otherwise settled theories or techniques,' " *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 460, 597 S.E.2d 674, 687 (2004), it should look "beyond precedent to determine whether an expert's area of testimony is sufficiently reliable," the trial court was simply not presented with any such evidence in this case and did not, for that reason, have any opportunity to determine whether accepted medical thinking on the issues relevant to this case had changed. Moreover, Defendant's contention that aspects of the testimony of the State's witnesses conflicted with certain autopsy findings and with other "medical facts" and that there were contradictions and inconsistencies among the testimony offered by the State's experts ignores well-established North Carolina law to the effect that "[d]iscrepancies and contradictions in the evidence are for the jury to resolve." *State v. Hendrix*, 19 N.C. App. 99, 101, 197 S.E.2d 892, 893 (1973). Finally, Defendant's contention that the testimony of Dr. Privette and Dr. Bouldin was overly "speculative" cannot be deemed persuasive in light of the detailed reasons that they gave in support of the conclusions that they reached. As a result, Defendant has failed to show that the trial court committed plain error by admitting the testimony of the State's expert witnesses, so he is not entitled to relief on the basis of this claim.

## B. Sufficiency of the Evidence

[2] Secondly, Defendant argues that the trial court erred by denying his motion to dismiss the charge against him for insufficiency of the evidence. More specifically, Defendant contends that "the evidence was insufficient to show that [Joan's] injuries were intentionally inflicted; that [Defendant] used his hands as deadly weapons; and that the injuries occurred at the time [Defendant] was caring for [Joan]." Defendant's argument lacks merit.

"In reviewing a motion to dismiss, this Court must determine 'whether there is substantial evidence of each essential element of the offense charged, or of a lesser offense included therein, and of the defendant's being the perpetrator of such offense.' Substantial evidence has been defined as 'that amount of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.' Further, the evidence should be considered in the light most favorable to the State and the State is entitled to every reasonable inference to be drawn therefrom. Any contradictions or discrepancies in the evidence are for resolution by the jury and do not warrant dismissal." *State v. Carrilo*, 149 N.C. App. 543, 548, 562 S.E.2d 47, 50 (2002) (quoting *State v. Bates*, 313 N.C. 580, 581, 330 S.E.2d 200, 201 (1985), and *State v. Porter*, 303 N.C. 680, 685, 281 S.E.2d 377, 381 (1981) (other citation omitted)). "Further, if the trial court determines that a reasonable inference of the defendant's guilt may be drawn from the evidence, it must deny the defendant's motion and send the case to the jury even though the evidence may also support reasonable inferences of the defendant's innocence." *State v. Wright*, 127 N.C. App. 592, 597, 492 S.E.2d 365, 368 (1997) (citing *State v. Scott*, 323 N.C. 350, 353, 372 S.E.2d 572, 575 (1988)), *disc. review denied*, 347 N.C. 584, 502 S.E.2d 616 (1998).

N.C. Gen. Stat. § 14-17(a) provides, in pertinent part, that any murder "which shall be committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree[.]" "[F]elonious child abuse committed with the use of a deadly weapon may serve as the underlying felony for felony murder purposes [in the event that the State proves] beyond a reasonable doubt that defendant actually intended to commit the underlying offense (felonious child abuse) with the use of [his] hands as a deadly weapon[.]" *State v. Krider*, 145 N.C. App. 711, 714, 550 S.E.2d 861, 863 (2001) (citing *State v. Jones*, 353 N.C. 159, 168, 538 S.E.2d 917, 925 (2000), and *State v. Pierce*, 346 N.C. 471, 493, 488 S.E.2d 576, 589 (1997)), *appeal dismissed*, 355 N.C. 219, 560 S.E.2d 150 (2002).

According to N.C. Gen. Stat. § 14-318.4(a), "[a] parent or any other person providing care to or supervision of a child less than 16 years of age who intentionally inflicts any serious physical injury upon or to the child or who intentionally commits an assault upon the child which results in any serious physical injury to the child is guilty of a Class E felony[.]"

> Specific-intent crimes are "crimes which have as an essential element a specific intent that a result be reached." General-intent crimes are "crimes which only require the

doing of some act." Felonious child abuse requires the State to prove "that the accused intentionally inflicted a serious physical injury upon the child or intentionally committed an assault resulting in a serious physical injury to the child." The State is not required to prove that the defendant "specifically intended that the injury be serious." Felony murder on the basis of felonious child abuse requires the State to prove that the victim was killed during the perpetration or attempted perpetration of felonious child abuse with the use of a deadly weapon. See N.C. [Gen. Stat.] § 14-17. This crime does not require the State to prove any specific intent on the part of the accused.

*Pierce*, 346 N.C. at 494, 488 S.E.2d at 589 (quoting *State v. Jones*, 339 N.C. 114, 148, 451 S.E.2d 826, 844 (1994), *cert. denied*, 515 U.S. 1169, 115 S. Ct. 2634, 132 L. Ed. 2d 873 (1995); *State v. Elliott*, 344 N.C. 242, 278, 475 S.E.2d 202, 218-19 (1996), *cert. denied*, 520 U.S. 1106, 117 S.Ct. 1111, 137 L.Ed.2d 312 (1997); and *State v. Campbell*, 316 N.C. 168, 172, 340 S.E.2d 474, 476 (1986)). As a result, "[f]elony murder on the basis of felonious child abuse requires the State to prove that the killing took place while the accused was perpetrating or attempting to perpetrate felonious child abuse with the use of a deadly weapon." *See* N.C. [Gen. Stat.] § 14-17. "When a strong or mature person makes an attack by hands alone upon a small child, the jury may infer that the hands were used as deadly weapons." *Pierce*, 346 N.C. at 493, 488 S.E.2d at 589 (citing *Elliott*, 344 N.C. at 268-69, 475 S.E.2d at 213 and *State v. Lang*, 309 N.C. 512, 527, 308 S.E.2d 317, 325 (1983)). Moreover, "when an adult has exclusive custody of a child for a period of time during which the child suffers injuries that are neither self-inflicted nor accidental, there is sufficient evidence to create an inference that the adult intentionally inflicted those injuries." *State v. Liberato*, 156 N.C. App. 182, 186, 576 S.E.2d 118, 120-21 (2003) (citing *State v. Riggsbee*, 72 N.C. App. 167, 171, 323 S.E.2d 502, 505 (1984)).

A careful examination of the record evidence considered in the light most favorable to the State tends to show that Joan was a normal, healthy baby who had no medical problems in the days leading up to her death. By the age of fourteen months, Joan could walk, drink from a cup and hold a bottle, and had no tendency to choke when consuming food or drink. After Defendant moved in with Ms. Wright, Joan "started to . . . scream a lot" when Defendant held her, while Defendant "just didn't like the fact" that Joan tended to cling to her mother. The record further reflects that, on the morning of 7 December 2010, Joan had no

**STATE v. PERRY**

[229 N.C. App. 304 (2013)]

visible bruises, ate normally and appeared healthy. After Ms. Wright left the house on the morning of 7 December 2010, Defendant was the only adult in the house with Joan. Although Joan sounded normal when Ms. Wright heard her over the phone at around 11:30 a.m., Defendant told Ms. Wright that Joan was not breathing and was "gone" about 30 minutes later. At the time that emergency medical services personnel arrived, Joan was unconscious, unresponsive, and barely breathing. By the time that an ambulance carrying Joan reached the hospital, Joan had started to "seize and posture," indicating that she had a grave, potentially fatal, condition. Although Joan was treated at Wake Medical Center and University of North Carolina Medical Center, she never regained consciousness and was pronounced dead early on 9 December 2010. An external examination of Joan's body revealed the presence of bruises and scratches, including unusual bruises on her buttocks that were not "typical" of the bruises that usually resulted from a toddler's fall and a recently inflicted blunt force injury to her ribs that did not appear to have resulted from the administration of CPR. An internal examination showed that Joan had suffered extensive bilateral retinal hemorrhages in multiple layers of the retinae in her eyes, significant cerebral edema or swelling, and extensive bleeding or subdural hemorrhage in her brain, indicating that Joan's head had been subjected to a number of individual and separate blunt force injuries that were sufficiently significant to damage Joan's brain and to cause a leakage of blood. Joan's injuries, which could have been caused by human hands, did not result from medical treatment or a mere fall from a couch onto a carpeted floor. According to the State's evidence, it would be an extraordinarily rare occurrence for a child to die from a two to three foot fall, and the size, location, and degree of Joan's subdural hematoma and edema and the fact that Joan exhibited the presence of extensive retinal hemorrhages were inconsistent with the minor injuries that are typically sustained in a fall and are more consistent with the sort of injuries that are typically sustained in a motor vehicle accident. The record evidence which we have summarized in this paragraph is more than sufficient to support a jury determination that Defendant had exclusive custody of Joan at the time that she suffered fatal injuries, that her injuries were neither self-inflicted nor accidental, and that Defendant's account of what had happened to Joan conflicted with the relevant medical evidence. For that reason, the record contained sufficient evidence to allow the jury to find that Defendant had intentionally assaulted Joan while using his hands as deadly weapons and that Joan sustained fatal injuries as a result of this assault. Therefore, we conclude that the trial court did not err by denying Defendant's dismissal motion.

In seeking to persuade us to reach a different result, Defendant argues that the State did not adduce evidence that Joan's injuries were intentionally inflicted, rather than accidental. However, Dr. Berkoff specifically testified that, in her opinion, Joan's death resulted from abusive head trauma. In addition, both Dr. Privette and Dr. Bouldin testified that Joan's death likely resulted from an intentional rather than an accidental injury. Thus, the record contains ample evidence tending to show that Joan's injuries were intentionally, rather than accidentally, inflicted.

Secondly, Defendant directs our attention to evidence that differentiates this case from other similar cases in which we have held that the evidence was sufficient to support a conviction, and to evidence that in Defendant's view tended to show Defendant's innocence. For example, Defendant points to the fact that the record did not reveal the existence of a long-term history of abuse, that Defendant gave a consistent account of what happened on the morning of Joan's death, and that Dr. Jason testified that the injuries which Joan sustained could have been of accidental origin. However, as we have previously discussed, the fact that the record contains evidence that tends to contradict the evidence presented by the State does not justify the dismissal of a criminal charge for insufficiency of the evidence.

Similarly, Defendant argues that the record does not contain sufficient evidence to permit the jury to find that he used his hands as a deadly weapon. In support of this argument, Defendant places principal reliance on a comparison of the facts in this case with the facts present in other cases in which a defendant's hands have been found to be a deadly weapon, noting that, in each of these cases, either the defendant admitted to having used his hands to injure a child or there was additional evidence bearing on the "hands as a deadly weapon" issue. In light of the testimony given by the State's expert witnesses that Joan suffered severe injuries that were traumatic in origin, that Joan's death resulted from these injuries, that the injuries which Joan had sustained could have been caused by human hands, and that, until the morning of 7 December 2010, Joan was a normal, healthy, and uninjured child, we hold that the record contained sufficient circumstantial evidence to support a determination that Defendant used his hands as a deadly weapon.

Moreover, Defendant argues that the State failed to establish that Joan's injuries occurred when she was in Defendant's exclusive custody. However, Dr. Berkoff testified that Joan's injuries occurred after Ms. Wright heard Joan speaking normally at around 11:30 a.m. on 7 December 2009 given the "rapid onset" of symptoms resulting from abusive head trauma. The undisputed evidence reflects that Joan was in

the exclusive custody of Defendant during the time between his 11:30 a.m. phone call with Ms. Wright and the time at which Joan's injuries were reported to Ms. Wright and emergency medical services personnel. Although Defendant argues that certain "medical literature" suggests that a child may have a "lucid interval" of up to 72 hours after an injury, no such evidence was offered at trial. Even if such evidence had been presented for the jury's consideration, such evidence would go to the weight rather than the sufficiency of the State's evidence. Finally, Defendant's citation to *State v. Reber*, 71 N.C. App. 256, 321 S.E.2d 484 (1984), *disc. review denied*, 313 N.C. 335, 327 S.E.2d 897 (1985), is unavailing in that, in *Reber*, unlike this case, none of the expert witnesses testified that the child's injuries had occurred during the time when she was alone with the defendant. Thus, we conclude that there was sufficient evidence to allow an inference that Joan's injuries were sustained while she was in Defendant's exclusive custody. As a result, the trial court did not err by denying Defendant's dismissal motion.

### C. Felony-Murder Charge Predicated on Felonious Child Abuse

**[3]** Thirdly, Defendant argues that, "under the merger doctrine, felony child abuse is not a viable underlying felony" sufficient to support a conviction for first degree murder under the felony murder rule. Although Defendant "acknowledges that this issue has been decided adversely [to his position] by the Court of Appeals," he has "raise[d] the claim for potential further review." However, we lack the authority to provide Defendant with the further review that he seeks. According to well-established law, "[w]here a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court." *In re Appeal of Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989). As a result, Defendant is not entitled to relief based on this challenge to the trial court's judgment.

### D. Cruel and Unusual Punishment

**[4]** Finally, Defendant argues that his conviction and resulting sentence of life imprisonment without the possibility of parole are "disproportionate" and constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. Defendant's argument lacks merit.

The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." "The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual

punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' " *Graham v. Florida,* 560 U.S. 48, ___, 130 S. Ct. 2011, 2021, 176 L. Ed. 2d 825, 835 (2010) (quoting *Weems v. United States,* 217 U.S. 349, 367, 30 S. Ct. 544, 54 L. Ed. 793 (1910)). In determining whether a particular sentence is categorically disproportionate, the United States Supreme Court has "used categorical rules to define Eighth Amendment standards" which consider both the nature of an offense and the offender characteristics, and has concluded, among other things, that capital punishment is impermissible for offenses other than homicide, for offenders who committed a homicide before the age of eighteen, or for persons with very low intellectual functioning. *Id.*

Defendant does not argue that imposition of a sentence of life imprisonment without the possibility of parole for the offense of first degree murder is categorically impermissible, or that he is a member of a category or class of offender for whom such a sentence would violate the Eighth Amendment. Moreover, the Supreme Court has held "that neither imposition of a life sentence nor imposition of consecutive life sentences for first-degree murder constitutes cruel and unusual punishment." *State v. Bronson,* 333 N.C. 67, 81, 423 S.E.2d 772, 780 (1992). In addition, "North Carolina courts have consistently held that when a punishment does not exceed the limits fixed by the statute, the punishment cannot be classified as cruel and unusual in a constitutional sense." *State v. Evans,* 162 N.C. App. 540, 544, 591 S.E.2d 564, 567 (2004) (citation omitted). According to N.C. Gen. Stat. § 14-17(a), a murder committed during the commission of certain categories of felonies constitutes first degree murder, which is a Class A offense. N.C. Gen. Stat. § 15A-1340.17(c) provides that, upon conviction of a Class A offense, a defendant shall be sentenced to "life imprisonment without parole or death[.]" Thus, the sentence imposed upon Defendant was authorized by statute. Once again, as we have already noted, this Court is bound by its previous decisions. As a result, given that the sentence imposed upon Defendant was authorized by the relevant statutory provisions, it cannot be "classified as cruel and unusual in a constitutional sense." *Evans,* 162 N.C. App at 544, 591 S.E.2d at 567. Thus, Defendant is not entitled to relief on the basis of a categorical challenge to his sentence.

In addition, Defendant urges this court to find that, even if his sentence is constitutional under the principle enunciated in the preceding paragraph, it is not "proportionate to the crime committed." In support of this contention, Defendant directs our attention to the proportionality review conducted in capital cases and urges us to conduct a similar

review in this case. We conclude that Defendant has failed to establish a right to relief based on the argument that his sentence, while generally permissible for the crime of first degree murder, is disproportionate when applied to his individual circumstances.

"The controlling opinion in *Harmelin* explained its approach for determining whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime" and directed that a "court must begin by comparing the gravity of the offense and the severity of the sentence." *Graham*, 560 U.S. at __, 130 S. Ct. at 2022, 176 L. Ed. 2d at 836 (citing *Harmelin v. Michigan*, 501 U.S. 957, 1005, 111 S. Ct. 2680, 2707, 115 L. Ed. 2d 836, 871 (1991) (opinion of Kennedy)). "Only in exceedingly rare noncapital cases will sentences imposed be so grossly disproportionate as to be considered cruel or unusual." *State v. Green*, 348 N.C. 588, 609, 502 S.E.2d 819, 832 (1998) (citing *Rummel v. Estelle*, 445 U.S. 263, 272, 63 L. Ed. 2d 382, 389, 100 S. Ct. 1133 (1980) (other citation omitted), *cert. denied*, 525 U.S. 1111, 119 S.Ct. 883, 142 L.Ed.2d 783 (1999). We see no basis, given the facts surrounding the crime for which Defendant has been convicted, for concluding that this is one of the "exceedingly rare noncapital cases" in which the sentence imposed is "grossly disproportionate" to the crime for which Defendant stands convicted.

In urging us to reach a different result, Defendant argues, among other things, that the record evidence fails to conclusively establish his guilt. For example, Defendant contends that the evidence against him was circumstantial, repeats his argument that the expert testimony presented by the State was "contrary to medical facts and current research," and reiterates that his expert witness testified that Joan's injuries could have been the result of an accident. In addition, Defendant directs our attention to other felonious child abuse cases that, in his opinion, were more egregious than this case. However, the evidence presented in this case by the State, which the jury clearly believed, tended to show that Defendant intentionally inflicted a number of severe and traumatic injuries to the head and body of a previously healthy fourteen month old child, causing massive swelling and bleeding in and around the brain, extensive retinal hemorrhaging, and death. As a result, we see no basis for concluding that Defendant's sentence was so disproportionate as to constitute prohibited cruel and unusual punishment.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that none of Defendant's challenges to the trial court's judgment have merit. As

a result, the trial court's judgment should, and hereby does, remain undisturbed.

NO ERROR.

Judges ROBERT C. HUNTER and STROUD concur.