STATE v. MOSS

[139 N.C. App. 106 (2000)]

STATE OF NORTH CAROLINA v. ROBERT ANTHONY MOSS

No. COA99-680

(Filed 18 July 2000)

**1. Evidence— expert—opinion—extent of injuries—inconsistency with medical history**

The trial court did not err in a second-degree murder case by allowing an expert witness to testify that he felt the severity and the extent of the minor child's injuries were not consistent with the history obtained from the medic and from defendant-father, because: (1) the expert was in a better position to form an opinion about the child's injuries than the jury; (2) the expert did not testify as to what in fact caused the injuries, nor did he express an opinion about the culpability of defendant; and (3) the expert did not improperly discuss defendant's character.

**2. Evidence— expert—extent of injuries—time and causation**

The trial court did not err in a second-degree murder case by allowing an expert witness to testify that from a single fall of 18 inches it is virtually impossible to produce the extent of injuries the minor victim had, because: (1) the statements were not used as character evidence to impeach defendant's credibility; and (2) the testimony was used to explain how external bruising may reveal both the time and cause of injury, which was probative of the ultimate issue in the case.

**3. Homicide— second-degree murder—requested instruction—accident**

The trial court did not err in a second-degree murder case by denying defendant's request for a jury instruction on the defense of an accident, because defendant failed to show how he was prejudiced by the refusal to submit the requested instruction that the minor victim sustained injuries when he fell from a bed possibly after being shoved by the family's dog, based on the facts that: (1) the jury was instructed on second-degree murder and involuntary manslaughter, and chose to convict defendant of second-degree murder; and (2) the conviction for an intentional killing as opposed to an involuntary killing precludes the possibility that the same jury would have accepted defendant's claim that the victim accidentally fell from the bed even if it had been given the requested instruction.

STATE v. MOSS

[139 N.C. App. 106 (2000)]

Appeal by defendant from judgment entered 14 January 1999 by Judge Marvin K. Gray in Mecklenburg County Superior Court. Heard in the Court of Appeals 18 April 2000.

*Attorney General Michael F. Easley, by Assistant Attorney General Francis J. Di Pasquantonio, for the State.*

*Goodman, Carr, Nixon, Laughrun & Levine, P.A., by George V. Laughrun, II, for defendant.*

McGEE, Judge.

Defendant Robert Anthony Moss was convicted on 14 January 1999 of second degree murder of his infant son. Defendant was sentenced to 130 to 165 months' imprisonment. The evidence at trial tended to show that Robert Anthony Moss, Jr. was born on 22 August 1997 to defendant and Pamela Moss (Pamela), who nicknamed him "T.J." (T.J.). On the night of 9 December 1997, defendant dialed 911 to obtain emergency assistance for T.J. Defendant reported on the telephone that T.J. had been injured in a fall. Defendant next telephoned Pamela, who was working at a Harris Teeter grocery store that night, to inform her that T.J. "fell and [was] crying."

June Stillwell (Stillwell), an emergency medical technician and a captain in the Charlotte Fire Department who first arrived at defendant's apartment, testified T.J. was "very, very pale" or "very, very ashen" and was making a "humming or a moaning or a whimpering noise" that signaled "some serious problems with the child." Stillwell said T.J. was not responsive and his eyes were very tightly closed. When his eyes were forced open, Stillwell said T.J.'s eyes were "looking up to the left" and "rolled back into his head."

Stillwell testified that when she asked defendant what happened to T.J., defendant responded that he believed T.J. had fallen from a bed but that he did not see T.J. fall. When the ambulance arrived, the paramedics transported T.J. to the hospital immediately and defendant rode in the passenger seat "with tears on his face." Defendant watched the paramedics treat T.J. through a glass window behind his seat in the ambulance, and at the hospital defendant was allowed to hold T.J., whose noises had ceased and whose color had improved. Stillwell told defendant that T.J. seemed "comfortable" and "content" in the arms of defendant, but defendant said that was unusual because T.J. never relaxed with him, only with Pamela.

Cynthia Willis-Mecimore (Willis-Mecimore), an emergency medical technician who was in the ambulance that arrived at defendant's residence soon after the fire department officers, testified that when she saw T.J. his "eyes [were] deviated and fixed back, which is very unusual." She also stated that T.J. was "making a very low . . . humming sound," and had a "small red spot" on his forehead, but was breathing normally. T.J. did not respond when Willis-Mecimore touched his hands and legs, but rather trembled slightly in "seizure like activity." His hands were "very tight, almost claw like," and when Willis-Mecimore asked defendant what had happened, he told her T.J. "fell from a bed." When Willis-Mecimore looked at the bed, she saw three pillows placed around the edge acting as a "wall" to keep T.J. from rolling off the side, and a carpeted floor approximately two feet beneath. Willis-Mecimore stated to defendant at the hospital that T.J.'s beginning to cry was "a good thing," to which defendant replied that "[T.J.] cries a lot when he's with me and I'm not able to make him stop."

Valencia Kay Rivera (Rivera), an investigator with the Family Services Bureau of the Charlotte Police Department, interviewed defendant in a hospital waiting room. Defendant told her he fed T.J. between 8:00 and 8:30 p.m. and laid him down in a crib at about 9:30 p.m. T.J. was crying, so defendant lifted him and placed him onto his bed in the bedroom. Defendant said he positioned three pillows around T.J. to keep him from falling off the bed, one at the end and one at each side of T.J.'s body. He then went to sleep next to T.J., woke up during the night from T.J.'s crying, and found T.J. was lying face-up on the floor with his head against the night stand and a pillow on top of him. Defendant surmised that "the dog must have jumped up on the bed and pushed the baby off." Defendant said the dog was a 120-pound mixed breed. Rivera testified that defendant was "very nervous" during the interview. Later Rivera inspected defendant's bedroom, with consent from defendant and Pamela. Rivera said the bedroom had "typical apartment carpeting" and, commenting on the height of the bed, said it "came to [the middle of her] knees," or about eighteen inches high. She stated that the dog did not appear to be aggressive and that it weighed approximately sixty pounds. The following day the dog was weighed and determined to be fifty-six pounds. Rivera had another conversation with defendant at approximately 8:00 a.m. in the pediatric ward of the hospital, while T.J. was in surgery. Defendant stated that he "didn't want to talk anymore." About one hour later, Rivera received a telephone call informing her that T.J. had died in surgery.

STATE v. MOSS

[139 N.C. App. 106 (2000)]

Three doctors testified for the State at trial. Dr. Steven Robert Munson (Dr. Munson), an emergency physician at the hospital, first treated T.J. Dr. Munson found that T.J. had a small bruise on his forehead and swelling on the back of the head where it joined the neck. He sedated T.J. to minimize his movement and ordered a "CT scan" that revealed multiple skull fractures, a shift of the midline of the brain indicating increased pressure on the brain, and a subdural hematoma which is a collection of blood between the skull and brain from ruptured veins associated with trauma. Dr. Munson determined that T.J.'s "level of consciousness was decreased far more than [he] thought it should be" and T.J.'s left eye was not functioning properly. In an effort to decrease T.J.'s internal cranial pressure, Dr. Munson moved him to the intensive care unit under chemical paralysis. T.J. was breathing through a plastic tube inserted into his trachea and was receiving medication through an intravenous line inserted into his chest cavity. Dr. Munson testified that the injuries to T.J., being so severe, were not consistent with the history provided to Dr. Munson, and thus he notified the police department for an investigation.

Dr. Craig Andrew Vanderveer (Dr. Vanderveer), a board certified neurological surgeon and chief of neurosurgery at the hospital who performed the emergency surgery on T.J., testified that approximately forty percent of his case load involved cerebrovascular surgery, and twenty percent trauma surgery. Upon review of the CT scan results, Dr. Vanderveer found that T.J.'s brain "was largely disrupted" by more than trivial trauma. The brain had both "old" and "fresh" blood clotted onto it, which evidenced "two violent traumas," and Dr. Vanderveer "wiggled out a big pancake of clot." Dr. Vanderveer said that normally that would mark the successful end of the procedure, but in this case T.J.'s brain suddenly began to erupt out of the hole they had cut in his skull, causing death. Dr. Vanderveer said an "extremely violent" or "tremendous" angular force was applied to T.J., such as a "very large punch" or "swinging" his body against something solid. He testified that not even falling down a flight of stairs could have caused the injury. Moreover, the bleeding was "virtually circumferential all the way around the head," which demonstrates multiple points of impact as opposed to just one impact from a fall.

Dr. Michael Sullivan (Dr. Sullivan), a forensic pathologist and medical examiner for Mecklenburg County who performed an autopsy of T.J., testified that by studying fractures and hematomas in T.J., he identified a "[m]inimum of three" blows to the head, the least

serious one to the forehead and the more serious ones to the left and right sides. When asked about the claim that T.J. fell from a bed, Dr. Sullivan stated that the injuries T.J. sustained "are not consistent with that history." He felt that the injuries were from "blows to the head" that had occurred "in the short time frame prior to when 911 was called, at which time the child became symptomatic." Dr. Sullivan clarified that "short time frame" meant "minutes" or "less than an hour."

Defendant testified at trial that T.J. fell from the bed and that he did not inflict injuries on his son. He stated that he did not push, hit or slap his son, or hit him with a blunt object, or "hit him on the bed." He also presented testimony from his wife, who said "I know that [defendant] did not do this." Dr. Fred Culpepper, T.J.'s pediatrician, testified that "there were no bruises found" on T.J. during any of his five office visits. Other witnesses testified as to defendant's reputation for truthfulness.

Defendant was convicted of second degree murder on 14 January 1999. Upon finding that an aggravating factor that the victim was very young outweighed mitigating factors that defendant has been a person of good character, supported his family, had support in the community and was gainfully employed, the trial court sentenced defendant to 130 to 165 months' imprisonment. Defendant appeals.

Defendant argues the trial court erred in: (1) allowing Drs. Munson and Sullivan to testify as to their opinion of the cause of T.J.'s injuries, (2) allowing Dr. Vanderveer's testimony as to how the injuries "may have occurred," and (3) failing to instruct the jury on the defense of accident.

[1] Defendant offers several arguments why Dr. Munson should not have been allowed, over defendant's objection, to testify he "felt the severity and the extent of the injuries were not consistent with the history that [he] obtained from the medic and from the Defendant." Defendant contends that such testimony violated the criteria for allowing expert medical testimony, which are enumerated in *State v. Brown*, 300 N.C. 731, 268 S.E.2d 201 (1980):

> (1) the witness because of his expertise is in a better position to have an opinion on the subject than the trier of fact,

> (2) the witness testifies only that an event *could* or *might* have caused an injury but does not testify to the conclusion that

the event did in fact cause the injury, unless his expertise leads him to an unmistakable conclusion and

    (3) the witness does not express an opinion as to the defendant's guilt or innocence.

*Brown*, 300 N.C. at 733, 268 S.E.2d at 203. According to defendant, the first criterion is not satisfied; it is not clear which of the other two he also rejects. Regardless, we believe all three conditions are satisfied such that the trial court did not err in allowing Dr. Munson's testimony as to his observation that T.J.'s injuries did not match the history with which he was provided. Dr. Munson taught emergency medicine in the United States Navy for four years after his medical training, became board certified in 1987 and re-certified in 1997, and has had specific training in the recognition, treatment and stabilization of head trauma. As for the three criteria in *Brown*, Dr. Munson was in a better position to form an opinion about T.J.'s injuries than the jury, did not testify as to what in fact caused the injuries, and did not express an opinion about the culpability of defendant.

Defendant also construes Dr. Munson's opinion as a presentation of evidence by the State to show bad character on the part of defendant. In his brief, defendant argues

[t]he jury was basically presented with a scenario that the Appellant gave a version of the events and the expert Dr. Munson was allowed, over objection, to testify that in his opinion the injuries could not have been inflicted in that manner. Thus, the bottom line was the expert commented and gave expert testimony on the Appellant's credibility. . . . The general proposition is that the State is prohibited from offering testimony as to an accused's character in a criminal trial unless it is relevant for some purpose other than showing character.

We are aware that "[w]here a defendant has neither testified as a witness nor introduced evidence of his good character, the State may not present evidence of his bad character for any purpose." *State v. Sanders*, 295 N.C. 361, 373, 245 S.E.2d 674, 683 (1978), *cert. denied*, 454 U.S. 973, 70 L. Ed. 2d 392 (1981); N.C. Gen. Stat. § 8C-1, Rule 404(a) (1999) (evidence of a person's character is not admissible to prove he acted in conformity therewith on a particular occasion). However, Dr. Munson did not discuss the character of defendant, and thus Rule 404(a) has no application. Using Dr. Munson as an expert witness, the State merely presented its own theory of the case, which

invariably undermines most or all proponents of the defense theory, and vice versa.

**[2]** As for Dr. Vanderveer, defendant specifically opposes the inclusion of testimony, over defendant's objection at trial, that "from a single fall of 18 inches, it is virtually impossible to produce a picture like this." Defendant also argues against the inclusion of Dr. Vanderveer's statement that "in the far reaches of probability, it's possible that a fall of 18 inches could produce a portion of perhaps one of these" injuries. Defendant's argument against admitting this testimony "reiterate[s] the argument made with regard to Dr. Munson's testimony."

First, defendant argues that Dr. Vanderveer made these statements to attack the credibility of defendant when the issue of his credibility had not been presented to the jury, and second, defendant admits Dr. Vanderveer "is a schooled expert in neurological surgery procedures" but contends that "his opinion did absolutely nothing to assist the factfinder in deciding the ultimate issue[.]" Dr. Vanderveer saw T.J.'s internal injuries during surgery and, being an expert, he offered important information which would assist a jury. The statements by Dr. Vanderveer were properly admitted, and they are not character evidence used to impeach the credibility of defendant, as we discussed in rejecting defendant's same argument against the admission of specified statements by Dr. Munson.

Defendant also challenges other testimony by Dr. Vanderveer, namely that an impact with a soft surface such as a mattress might not leave external bruising, on the ground that its probative value was substantially outweighed by the danger of unfair prejudice. Defendant then argues the statements were altogether irrelevant. We reject both contentions. This testimony explained how external bruising may reveal both the time and cause of injury, and thus was highly probative as to the ultimate issue in the case. The trial court properly admitted such testimony.

Defendant also raises the same arguments as they relate to the testimony by Dr. Sullivan that his findings of injury were not consistent with T.J.'s reported history. These arguments fail for the same reasons stated above.

**[3]** In his last argument defendant argues the trial court erred in refusing to grant his request for a jury instruction on the defense of accident. "Pursuant to N.C.G.S. 1A-1, Rule 51 (1990), the trial court is

'required to instruct a jury on the law arising from the evidence presented[.]' " *McLain v. Taco Bell Corp.*, 137 N.C. App. 179, 527 S.E.2d 712 (2000) (quoting *Lusk v. Case*, 94 N.C. App. 215, 216, 379 S.E.2d 651, 652 (1989)). "The defense of accident 'is triggered in factual situations where a defendant, without premeditation, intent, or culpable negligence, commits acts which bring about the death of another.' " *State v. Turner*, 330 N.C. 249, 262, 410 S.E.2d 847, 854 (1991) (quoting *State v. Lytton*, 319 N.C. 422, 425-26, 355 S.E.2d 485, 487 (1987)); *see also State v. Faust*, 254 N.C. 101, 112, 118 S.E.2d 769, 776, *cert. denied*, 368 U.S. 851, 7 L. Ed. 2d 49 (1961) (a killing will be excused as an accident when it is unintentional and when the perpetrator, in doing the homicidal act, did so without wrongful purpose or criminal negligence while engaged in a lawful enterprise). Where the defendant was not engaged in lawful conduct when the killing occurred, the evidence does not raise the defense of accident. *Faust*, 254 N.C. at 113, 118 S.E.2d at 776-77.

Here defendant presented evidence that T.J. sustained the injuries for which he was hospitalized on 9 December 1997 when he fell from a bed, possibly after being shoved by their dog. Defendant argues he simply placed T.J. onto a bed and then went to sleep next to him, which was not unlawful conduct. Thus, under such circumstances T.J.'s death would be adjudged an accident, and accordingly the defense of accident should have been instructed as an alternative verdict for the jury if it accepted defendant's testimony as true.

However, defendant has failed to show he was prejudiced by the trial court's refusal to submit the requested instruction, and therefore the error was harmless. *See State v. Riddick*, 340 N.C. 338, 343-44, 457 S.E.2d 728, 732 (1995). In *Riddick*, our Supreme Court held the trial court did not err in denying an instruction on accident. However, the *Riddick* Court said even if denying the instruction had been error, it was harmless for the reason that defendant, who was convicted of first degree murder rather than involuntary manslaughter, failed to show prejudice. The Court explained:

> The jury in the present case was instructed that it could not return a verdict finding the defendant guilty of first-degree murder unless it found beyond a reasonable doubt that the defendant specifically intended to kill the victim. In reaching its verdict convicting the defendant of first-degree murder, the jury found that the defendant had the specific intent to kill [the victim] and, necessarily, rejected the possibility that the killing was unintentional. Therefore, the jury verdict finding the defendant guilty of first-

degree murder, and not the unintentional act of involuntary manslaughter, precludes the possibility that the same jury would have accepted the defendant's claim that the shooting was accidental even if it had been given the requested instruction.

*Id.* at 344, 457 S.E.2d at 732. In the case before us, the jury was instructed on second degree murder as well as involuntary manslaughter. The jury convicted defendant of second degree murder, which required a finding of intent on the part of defendant. The conviction for an intentional killing as opposed to an involuntary killing "precludes the possibility that the same jury would have accepted the defendant's claim that [T.J. accidentally fell from the bed] even if it had been given the requested instruction." *Id.*

We find no prejudicial error by the trial court.

No error.

Judges GREENE and EDMUNDS concur.