IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-563

Filed 1 April 2026

Mecklenburg County, Nos. 19CR026394-590, 19CR243490-590, 19CR243491-590, 23CR006314-590, 23CR006315-590

STATE OF NORTH CAROLINA

v.

CALDWELL COLE, JR.

Appeal by defendant from judgments entered 26 July 2023 by Judge Louis A. Trosch, Jr., in Mecklenburg County Superior Court. Heard in the Court of Appeals 8 April 2025.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Teresa M. Postell, for the State.*
>
> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Kathryn L. VandenBerg, for defendant-appellant.*

ZACHARY, Judge.

Defendant Caldwell Cole, Jr., appeals from the trial court's judgments entered upon a jury's verdicts finding him guilty of two counts of first-degree murder, two counts of attempted first-degree murder, and one count of discharging a firearm within an occupied enclosure with the intent to incite fear. On appeal, Defendant raises a number of arguments concerning the sufficiency of the evidence, the trial court's jury instructions, and an alleged double-jeopardy violation. After careful review, we conclude that Defendant received a fair trial, free from error, but remand

for the limited purpose of correcting a clerical error in the judgment entered in file number 23CR006315-590.

## I. Introduction

On 18 November 2019, a Mecklenburg County grand jury returned indictments charging Defendant with two counts of first-degree murder and one count of attempted first-degree murder. On 15 May 2023, a Mecklenburg County grand jury indicted Defendant for an additional count of attempted first-degree murder and one count of discharging a firearm within an occupied enclosure with the intent to incite fear, in violation of N.C. Gen. Stat. § 14-34.10 (2025). The grand jury also issued a superseding indictment on the original charge of attempted first-degree murder.

Defendant's case came on for jury trial on 10 July 2023 in Mecklenburg County Superior Court. As will be thoroughly addressed herein, at trial, Defendant challenged the State's evidence against him on multiple grounds, including self-defense and the defense of accident. In light of the complex factual and procedural history of this case, as well as the competing standards of review applicable on appeal, we initially set forth only those facts required to understand the main parties and issues presented. Additional facts will be introduced throughout the opinion as necessary and appropriate.

## II. Background

The events giving rise to this case occurred in November 2019 in Charlotte, North Carolina. Back then, Defendant often spent time with Jennie Hurst, whom he

had known for over a decade. Defendant was 75 years old, and Hurst was at least 20 years younger. Hurst described Defendant as "a very good friend." Although their relationship was "sometimes" sexual, they never dated. Defendant suffered from various medical problems, including diabetes and arthritis, and he was often "in a lot of pain." Accordingly, approximately "once every couple of months," Defendant would hire Hurst to clean his house, help with yard work, or perform other odd jobs "that would . . . build up on him," due to his age and poor health. But this was not the typical dynamic of their relationship: Defendant always paid Hurst for her work on these rare occasions, and usually when she saw him, they just spent time together as friends.

In November 2019, Hurst was a regular user of cocaine. For several years, she was one of a rotating group who frequented a house on Lytham Drive in southwest Charlotte. Following a foreclosure, the Lytham Drive house had become a known "flop house," a place where people congregated to buy, sell, and use drugs. For approximately two or three years, Hurst went to the Lytham Drive house "[a] couple times a week" to purchase cocaine, and she was friendly with many of the people who lived and socialized there, including her drug dealer, Tilden Hoyle.[1] Defendant did

---

[1] One of the central legal and factual disputes at trial concerned the status of the Lytham Drive house and its occupants. Substantial conflicting evidence—and extensive legal argument—was presented regarding, *inter alia*, ownership and possession of the house; issues of agency and authority in the owner's extended absence; and the legal status of the various individuals who spent any amount of time at the house, whether as residents, visitors, trespassers, or otherwise. While subject to extensive debate throughout trial, and notwithstanding their threshold relevance to certain issues, none of these questions are before us on appeal.

not generally use cocaine, but he had driven Hurst to the Lytham Drive house on multiple occasions. Despite its reputation as a "flop house," Defendant knew the Lytham Drive house was not a "violent" or "angry place." While there with Hurst, Defendant would occasionally engage in "[f]riendly conversations" with other people gathered at the residence, and he never felt threatened.

On 8 November 2019, Defendant hired Hurst to help him "clean and declutter his house." He picked her up around noon, and throughout the day, the two drank alcohol and smoked marijuana together. Twice that day, they visited the Lytham Drive house, where Hurst purchased cocaine from Hoyle. Sometime after midnight, in the early morning hours of 9 November, Hurst asked Defendant to drive her home. On the way to Hurst's house, Defendant stated that he wanted to have sex; Hurst declined, stating: "That wasn't part of the deal." Defendant "got mad" and "wouldn't leave it alone." Instead of driving Hurst home, he ended up taking her to the Lytham Drive house.

During the drive, Defendant paid Hurst $20 for her help that day, but when they arrived at the Lytham Drive house, "he told [her] he wanted his money back." When Hurst refused to return the money, Defendant became "belligerent" and "fixated on wanting the $20 back." As Hurst exited the car, Defendant "reached over and grabbed [her] and [she] . . . jumped out." Hurst told Defendant to go home and repeated that she was not returning the money.

As Hurst turned and approached the house, Defendant got out of his car and

began following her. Holding his hand out, Defendant commanded: "Give me back my money." Hurst pulled the money out of her bra and, joking, told Defendant that he could have it if he could catch her. At some point, however, Hurst began to feel "scared"; she "could . . . feel the anger" emanating from Defendant as he followed "right behind" her, and she attempted "to keep some distance between" them. But Defendant "kept charging" her and demanding his money back. For the "[f]irst time ever," Hurst felt "very threatened" by Defendant.

Realizing that Defendant "wasn't going to leave [her] alone," Hurst "took off running." She fled around the side of the house, took refuge in a grassy area, and watched, scared, while Defendant combed the backyard searching for her. At one point, Defendant walked right by Hurst, unaware that she lay approximately 30 feet away, hidden in the "very, very dark" yard. Defendant eventually entered the Lytham Drive house, where he continued his unsuccessful search for Hurst, then sat down and "passed out."

Hurst initially planned to remain hidden in the grass until she saw Defendant "get in his car and leave" Lytham Drive. But "probably 30 minutes" after she had begun hiding, Hurst snuck onto the screened-in back porch, which also served as a bedroom and provided rear entry to the house. There, Hurst encountered her friend Donald "Trey" Portis, and she asked him whether Defendant remained inside the house. When Trey said yes, Hurst asked him to tell Defendant "to go home" and briefly summarized their ongoing dispute. Trey left the room for a while; Hurst did

not know where he was or what he was doing, but when he returned, he was accompanied by Justin Brim, another individual known to frequent the house at Lytham Drive. The men asked Hurst, "What's going on?", and she responded: "I don't know. [Defendant] is acting crazy. He's mad. He wants his money back, and I'm not giving it to him."

Defendant, meanwhile, was sitting on the couch in the living room, "waiting for [Hurst]." His behavior "was getting creepy"; he was "[n]ot really" speaking to anyone else at the house but "was just . . . kind of staring [them] down." One of those present, Furahn Morrow, told another, Jason Pope, that they "need[ed] to get [Defendant] out of the house." The men told Defendant that he needed to leave, but Defendant said that "he was not going anywhere." When Morrow grabbed Defendant's arm to help him up, Defendant "got agitated." The men guided Defendant to the front door and out of the house, and Pope locked the door behind him "to make sure he left."

Defendant was leaving when several of the Lytham Drive group approached. Having departed hours earlier to purchase cocaine, Hoyle, Janet Scronce, and Doug Bolten returned to Lytham Drive just as Defendant was driving away. The others informed them of Hurst's heated dispute with Defendant and explained that Morrow had ordered Defendant to leave. The group then entered the house, where Hoyle began "cooking" the powder cocaine into crack in the kitchen.

Approximately 15–20 minutes later, however, Bolten was watching the street

for law enforcement officers when he noticed that Defendant's car was back outside the premises. Hoyle had heard "rumors" that Defendant "was coming back to do harm," so he asked Bolten to look around for him. Bolten first checked Defendant's car, which was parked on the street, but Defendant was not inside. After retrieving his gun, Morrow joined Bolten in searching the areas around the front and side of the house, to no avail.

Morrow and Bolten were standing in the yard near the back porch, discussing how to proceed, when suddenly, Morrow pushed Bolten away and grabbed his gun. But before Morrow fully raised his gun, Bolten "heard a loud boom." Defendant shot Morrow in the face and Morrow fell to the ground. Bolten immediately fled and frantically sought shelter in an outdoor storage closet, crouched atop a water heater. However, Defendant soon discovered him, and he stood "in front of the door facing [Bolten] with the gun." Bolten held up his hands, "pleading for [his] life," as Defendant "turned around and looked back at [Morrow] on the ground, then looked back at [Bolten]." Without saying a word, Defendant shot Bolten and walked back toward the house.

Hoyle was one of approximately nine people in the kitchen when gunshots rang out in the backyard. At the sound, the occupants of the house immediately became hysterical. Defendant was heading from the backyard to the front when Bolten "fell" into the kitchen through the back door, "screaming" that "he had been shot by [Defendant]."

As Defendant entered the house through the front door and began shooting again, "[i]t was almost like a stampede. . . . Everybody [was] trying to run over everybody to get out of the kitchen." Hoyle and Scronce were at the front of the horde with "everyone else behind [them] trying to get out." But before Hoyle could exit the kitchen, he was shot and fell to the ground. Scronce, Hoyle's longtime girlfriend, witnessed the shooting and "was just standing there in disbelief" for a moment before she, too, was shot. Scronce "grabbed her neck and slowly dropped down to the floor."

Bolten left the kitchen and hid behind the backyard storage shed, where he called 9-1-1. Throughout the call, Bolten continued to hear gunshots.

Meanwhile, Hurst was hiding underneath a pile of dirty clothes in a bedroom. She could hear gunshots inside the house; "people screaming"; and "somebody saying, 'No. No. No. No. No. No.' " Hurst "felt like it was just a matter of time before [Defendant] made it to where [she] was" and that when he did, her "brains were going to get blown out." She "heard somebody say[,] 'Get the gun. Get the gun. Get the gun. Get the gun.' ", followed by "a scuffle."

Even after Defendant was subdued and the gun taken away from him, he was clutching extra ammunition.

On 26 July 2023, the jury returned verdicts finding Defendant guilty of all charges, to wit: two counts of first-degree murder (Furahn Morrow and Janet Scronce); two counts of attempted first-degree murder (Doug Bolten and Tilden Hoyle); and one count of discharging a firearm within an occupied enclosure with the

intent to incite fear. The trial court entered judgments sentencing Defendant to the following active terms in the North Carolina Department of Adult Correction: two terms of life imprisonment without the possibility of parole for Defendant's two convictions for first-degree murder; two terms of 144 to 185 months' imprisonment for his two convictions for attempted first-degree murder; and 15 to 27 months' imprisonment for Defendant's conviction for discharging a firearm within an occupied enclosure with the intent to incite fear.

Defendant entered oral notice of appeal.

### III.    Discussion

Defendant advances several arguments on appeal. First, he argues that the trial court erred by denying his motion to dismiss the charges of 1) attempted murder with regard to Doug Bolten, and 2) discharging a firearm within an occupied enclosure with the intent to incite fear.

Defendant also asserts that the trial court committed reversible error in its jury instructions 1) by delivering the felony-disqualifier limiting instruction under N.C. Gen. Stat. § 14-51.4(1), thereby allowing "the jury to reject self-defense based on other felonies that occurred after the shooting[s]" of Furahn Morrow and Doug Bolten; and 2) by denying his request for jury instructions on the defense of accident with regard to the charges arising from the shootings of Janet Scronce (first-degree murder) and Tilden Hoyle (attempted murder), and the charge of discharging a firearm within an occupied enclosure with the intent to incite fear.

Finally, Defendant contends that the trial court erred by entering the judgment and sentencing him for discharging a firearm within an occupied enclosure with the intent to incite fear when he "was also convicted of murder and attempted murder based on this same shooting, in violation of double jeopardy."

**A. Motion to Dismiss**

At the close of the State's evidence, defense counsel made a motion to dismiss all charges against Defendant, which he timely renewed at the close of all evidence. The trial court denied the motion on both occasions.

On appeal, Defendant challenges the sufficiency of the evidence to support the charges of 1) attempted murder as to Doug Bolten, and 2) discharging a firearm within an occupied enclosure with the intent to incite fear. After careful review, we conclude that the trial court did not err by denying Defendant's motion to dismiss these charges.

**1. Standard of Review**

"This Court reviews the trial court's denial of a motion to dismiss de novo." *State v. Mitchell*, 240 N.C. App. 246, 254, 770 S.E.2d 740, 746 (2015) (cleaned up).

In evaluating a defendant's motion to dismiss, the trial court views the evidence in the light most favorable to the State. *State v. Golder*, 374 N.C. 238, 250, 839 S.E.2d 782, 790 (2020). "[T]he State is entitled to every reasonable intendment and every reasonable inference to be drawn" from the evidence. *Id.* (citation omitted). "[I]f the record developed at trial contains substantial evidence, whether direct or

circumstantial, or a combination, to support a finding" of each essential element of the charged offense (or a lesser-included offense), "the case is for the jury and the motion to dismiss should be denied." *Id.* (cleaned up).

"To be substantial, the evidence need not be irrefutable or uncontroverted; it need only be such as would satisfy a reasonable mind as being adequate to support a conclusion." *State v. Butler*, 356 N.C. 141, 145, 567 S.E.2d 137, 139 (2002) (cleaned up). "Our Courts have established that a substantial evidence inquiry examines the sufficiency of the evidence presented *but not its weight*, which is a matter for the jury." *State v. McNeill*, 243 N.C. App. 762, 770, 778 S.E.2d 457, 463 (2015) (cleaned up), *disc. review denied*, 368 N.C. 689, 781 S.E.2d 482 (2016).

"Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal." *Mitchell*, 240 N.C. App. at 255, 770 S.E.2d at 746. Yet "[i]f the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed." *State v. Sharpe*, 289 N.C. 84, 87, 887 S.E.2d 116, 119 (2023) (cleaned up).

### 2. Attempted Murder of Doug Bolten

Defendant argues that the State failed to present substantial evidence that he intended to kill Doug Bolten; rather, he claims, "[t]he prosecution's evidence raised little more than suspicion or conjecture as to [Defendant]'s specific intent to kill" Bolten. We disagree.

"The elements of attempted first-degree murder are: (1) a specific intent to kill another; (2) an overt act calculated to carry out that intent, which goes beyond mere preparation; (3) malice, premeditation, and deliberation accompanying the act; and (4) a failure to complete the intended killing." *State v. Tirado*, 358 N.C. 551, 579, 599 S.E.2d 515, 534 (2004), *cert. denied*, 544 U.S. 909, 161 L. Ed. 2d 285 (2005).

"Because the crime of attempt requires an act done with the specific intent to commit the underlying offense, one must specifically intend to kill in order to commit the crime of attempted first[-]degree murder." *State v. Edwards*, 174 N.C. App. 490, 497, 621 S.E.2d 333, 338 (2005) (cleaned up). "Rather than simply showing that the defendant committed an intentional act that could have resulted in death, the State must show that the defendant intended for his action to result in the victim's death." *Id.* (cleaned up).

> In the context of attempted first[-]degree murder, an intent to kill and the existence of malice, premeditation and deliberation may be inferred from the conduct and statements of the defendant before and after the incident, ill-will or previous difficulty between the parties, and evidence regarding the manner of the attempted killing.

*State v. Peoples*, 141 N.C. App. 115, 118, 539 S.E.2d 25, 28 (2000) (citation omitted).

Viewed in the light most favorable to the State, the evidence was undoubtedly sufficient to withstand Defendant's motion to dismiss the charge of attempted first-degree murder with respect to Doug Bolten. After shooting Furahn Morrow in the face at close range, fatally wounding him, Defendant turned his attention—and his

- 12 -

gun—to Morrow's friend, Bolten. Although Bolten ran away, terrified, Defendant pursued him to the storage closet where he was attempting to hide, crouched atop a water heater. As he blocked the doorway, Defendant kept his gun aimed directly at Bolten, who raised his hands and implored Defendant: "Please don't shoot me. *I don't have a gun. I'm not here to hurt you.* Please don't shoot me." (Emphasis added). Defendant did not respond or acknowledge Bolten's pleas. Instead, he shot Bolten and turned away, leaving Bolten bleeding in the storage closet.

Defendant contends that the evidence merely raised "conjecture or suspicion" that he possessed the requisite specific intent to kill Bolten because Defendant "only shot [him] once and made no threats before or after the shooting." This assertion ignores both the circumstances immediately surrounding Bolten's shooting as well as the earlier precipitating events—all relevant and critical circumstantial evidence of Defendant's intent during the violence at Lytham Drive on 9 November 2019.

Indeed, as evinced by Defendant's shooting of Morrow—which occurred in Bolten's presence just before Defendant turned his gun on Bolten—one gunshot is certainly sufficient to kill another human being. And although Defendant argues that the absence of evidence that he verbally threatened Bolten "before or after the shooting" indicates that he lacked the requisite intent to kill, here, *Defendant's silence* communicated volumes. With Bolten cornered in the storage closet, pleading that he was unarmed and intended Defendant no harm, Defendant kept his gun raised and trained on Bolten. Without uttering a word, Defendant fired one shot into Bolten and

headed back toward the house, never stopping to render aid to either victim. *See id.* (providing that a specific intent to kill and the existence of malice, premeditation, and deliberation may be proven by circumstantial evidence including, *inter alia*, "the conduct and statements of the defendant before and after the incident" and "the manner of the attempted killing" (citation omitted)).

Viewed in the light most favorable to the State, there was substantial evidence presented to support each element of attempted first-degree murder with respect to Doug Bolten. Accordingly, the trial court did not err by denying Defendant's motion to dismiss this charge.

### 3. Discharging a Firearm Within an Occupied Enclosure with the Intent to Incite Fear

Defendant also challenges the trial court's denial of his motion to dismiss the charge of discharging a firearm within an occupied enclosure with the intent to incite fear. According to Defendant, "no evidence showed [he] intended to incite fear." We disagree.

Pursuant to N.C. Gen. Stat. § 14-34.10,

> Unless covered under some other provision of law providing greater punishment, any person who willfully or wantonly discharges or attempts to discharge a firearm within any occupied building, structure, motor vehicle, or other conveyance, erection, or enclosure with the intent to incite fear in another shall be punished as a Class F felon.

Using language that closely tracks the relevant portions of N.C. Gen. Stat. §

14-34.10, the indictment returned in the instant case charged Defendant as follows:

> THE JURORS FOR THE STATE UPON THEIR OATH PRESENT that on or about the 9th day of November, 2019, in Mecklenburg County, [Defendant] did unlawfully, feloniously, willfully and wantonly discharge a revolver, a firearm, within an occupied building, a house located at . . . Lytham Drive, Charlotte, North Carolina, with the intent to incite fear in others, to wit: the occupants of [the house at] Lytham Drive, Charlotte, North Carolina.

Thus, to satisfy its burden of proof, the State was required to present evidence that Defendant 1) willfully or wantonly discharged; 2) a firearm; 3) within an occupied building—specifically, the Lytham Drive house; 4) with the intent to incite fear in its occupants.[2] *See id. Cf. State v. Hardaway*, __ N.C. App. __, __, 922 S.E.2d

---

[2] We note that two panels of this Court have recently disagreed as to the appropriate interpretation of the governing statute, N.C. Gen. Stat. § 14-34.10. In both cases, the "occupied enclosures" at issue were motor vehicles, rather than a house, as in the present case. In *State v. Jenkins*, the Court considered whether N.C. Gen. Stat. § 14-34.10 requires proof "that both [the d]efendant *and* [the victim] must have been 'within *one* occupied motor vehicle' as of 'discharge' to merit conviction," or whether the "statute requires that *only* [the defendant] 'discharged a firearm within' either his *or* [the victim]'s 'occupied vehicle[.]' " __ N.C. App. __, __, 920 S.E.2d 524, 530 (2025) (cleaned up). In lengthy analysis drawing heavily from various canons of statutory interpretation, the *Jenkins* Court concluded that N.C. Gen. Stat. § 14-34.10 is "an umbrella statute that intentionally captures fear-causing gunfire from *any* occupied enclosure." *Id.* at __, 920 S.E.2d at 534.

Soon after *Jenkins*, another panel of this Court considered a very similar challenge to the third element of N.C. Gen. Stat. § 14-34.10: The defendant asserted that there was insufficient evidence "that he discharged the firearm *within* the car. He argue[d] the use of the word 'within' as used in the statute requires a showing that the requisite conduct occurred inside a single structure—that it 'encompasses an event occurring inside the covered conveyance rather than emanating from it.' " *State v. Hardaway*, __ N.C. App. __, __, 922 S.E.2d 709, 717 (2025), *petition for disc. review pending*, No. 345P25-1 (N.C. 2026). Facing the "same issue" as that addressed in *Jenkins*, "albeit in a different case," the *Hardaway* Court concluded that it was bound by precedent to reject the defendant's argument, unless and until *Jenkins* "has been overturned by a higher court." *Id.* (quoting *In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989)). A petition for discretionary review in *Hardaway* is currently pending our Supreme Court's review.

Notwithstanding the discrepancy in *Jenkins* and *Hardaway*—which, together, nearly comprise our entire body of case law addressing N.C. Gen. Stat. § 14-34.10—the instant case is readily

709, 717 (2025) (listing the essential elements of the offense where the occupied "enclosure" at issue is a motor vehicle), *petition for disc. review pending*, No. 345P25-1 (N.C. 2026).

Like attempted murder, a violation of N.C. Gen. Stat. § 14-34.10 is a specific-intent crime—that is, a crime that has "as an essential element a specific intent that a result be reached." *State v. Perry*, 229 N.C. App. 304, 318, 750 S.E.2d 521, 532 (citation omitted), *disc. review denied*, 367 N.C. 262, 749 S.E.2d 852 (2013). Hence, to obtain a conviction under N.C. Gen. Stat. § 14-34.10, the State must prove not only that the defendant "willfully or wantonly" discharged his firearm within one of the listed enclosures while then-occupied, but also that he did so "with the [specific] intent to incite fear in another"—here, the occupants of the house at Lytham Drive. N.C. Gen. Stat. § 14-34.10.

As stated above, it is well established that "[a] defendant's intent is seldom provable by direct evidence and must usually be proved through circumstantial evidence." *State v. Bediz*, 269 N.C. App. 39, 42, 837 S.E.2d 188, 191 (2019) (citation omitted). "The surrounding circumstances include the foreseeable consequences of a defendant's deliberate actions as a defendant must be held to intend the normal and natural results of his deliberate act." *Id.* (citation omitted).

---

distinguishable. Unlike *Jenkins* and *Hardaway*, in the case at bar, there is no dispute as to the third element of the offense or the proper interpretation of the statutory term "within," in that *all conduct covered by the relevant indictment occurred within the same occupied building: the Lytham Drive house*.

The evidence in the instant case, viewed in the light most favorable to the State, was certainly sufficient for a reasonable jury to find that Defendant intended to incite fear when he intentionally discharged his firearm within the crowded house at Lytham Drive. After shooting Morrow and Bolten in the backyard, Defendant—still armed with his gun and extra ammunition—walked around the side of the house, entered through the front door, and resumed shooting—this time, inside of the residence. As he did, "chaos" ensued. Hoyle testified that there were about nine people in the kitchen, and everyone was "[t]rying to get the hell out of the kitchen. It was almost like a stampede." Several people hid in a bathroom at the rear of the house; they "were peeking out and seeing that [Defendant had] the door open and [was] standing in the [kitchen] doorway." From her hiding place in a bedroom, underneath a pile of dirty clothes, Hurst could hear gunshots inside the house and "people screaming." After Defendant fired his gun inside the kitchen, Justin Brim saw Defendant "moving the gun around" as if "he was gonna clear out the home if someone else tried to come at him," and Brim "was scared to death." Brim and Trey then wrestled Defendant for the gun, ultimately subduing him while Defendant was still "[t]rying to shoot them." Clearly, Defendant had inspired fear—the foreseeable consequence of his "deliberate actions," which he "must be held to intend." *Id.* (citation omitted).

"[T]he rule for determining the sufficiency of evidence is the same whether the evidence is completely circumstantial, completely direct, or both." *State v. Wright*,

302 N.C. 122, 126, 273 S.E.2d 699, 703 (1981). Thus, the State presented sufficient evidence "as would satisfy a reasonable mind as being adequate to support a conclusion" that Defendant discharged his weapon within an occupied enclosure with the intent to incite fear. *Butler*, 356 N.C. at 145, 567 S.E.2d at 139 (cleaned up). The trial court, therefore, properly denied Defendant's motion to dismiss this charge.

## B. Jury Instructions

Defendant next proffers two arguments concerning the trial court's instructions to the jury: one regarding the trial court's inclusion of "a pattern instruction limiting [Defendant's] right of self-defense if he was attempting or committing a felony with a causal nexus to his use of defensive force," and one based on the court's refusal to instruct the jury on the defense of accident.

At the charge conference, defense counsel requested that the trial court instruct the jury on self-defense for the charges related to the backyard shootings of Furahn Morrow (first-degree murder) and Doug Bolten (attempted murder). Defense counsel also requested jury instructions on the defense of accident for the three charges arising from the shootings that occurred inside the house: attempted first-degree murder (Tilden Hoyle), first-degree murder (Janet Scronce), and discharging a firearm within an occupied enclosure with the intent to incite fear.

Following extensive argument and briefing on these issues, the trial court granted Defendant's request for jury instructions on self-defense as to the shootings of Morrow and Bolten but determined that the felony-disqualifier provision applied;

accordingly, the trial court delivered limiting instructions pursuant to N.C. Gen. Stat. § 14-51.4(1). The trial court denied Defendant's request for jury instructions on the defense of accident.

On appeal, Defendant asserts that the trial court committed reversible error with respect to both of these rulings.

### 1. Standard of Review

"The prime purpose of a court's charge to the jury is the clarification of issues, the elimination of extraneous matters, and a declaration and an application of the law arising on the evidence." *State v. Kuhns,* 260 N.C. App. 281, 284, 817 S.E.2d 828, 830 (2018) (citation omitted). To effectuate this purpose, the trial court must "instruct the jury on all substantial features of a case. Any defense raised by the evidence is deemed a substantial feature of the case." *State v. Stephens*, 275 N.C. App. 890, 893, 853 S.E.2d 488, 492 (2020) (cleaned up).

"For a particular defense to result in a required instruction, there must be substantial evidence of each element of the defense when viewing the evidence in a light most favorable to the defendant." *Id.* at 893–94, 853 S.E.2d at 492 (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 894, 853 S.E.2d at 492 (cleaned up).

"When determining whether the evidence is sufficient to entitle a defendant to jury instructions on a defense or mitigating factor, courts must consider the evidence

in the light most favorable to the defendant." *Id.* (cleaned up). "[T]he trial court's decisions regarding jury instructions are reviewed de novo by this Court." *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009) (italics omitted).

Nevertheless, it is well established that "an error in a criminal trial does not warrant disregarding a jury's finding of guilt unless that error prejudiced the defendant." *State v. Phillips*, 386 N.C. 513, 528, 905 S.E.2d 23, 33 (2024). "A non-constitutional error," such as the alleged instructional errors that Defendant raises on appeal, "is prejudicial when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." *Id.* (cleaned up). The "defendant bears the burden of demonstrating such prejudice" pursuant to N.C. Gen. Stat. § 15A-1443(a). *Id.*

### 2. Self-Defense

Defendant argues that the trial court erred by delivering, over his objection, a self-defense instruction with regard to the shootings of Furahn Morrow and Doug Bolten that included "a pattern instruction limiting [Defendant's] right of self-defense if he was attempting or committing a felony with a causal nexus to his use of defensive force." The limiting instruction, Defendant maintains, improperly included for the jury's consideration Defendant's allegedly felonious conduct that "occurred *after* the shootings" of Morrow and Bolten. We disagree.

Where, as in the case at bar, a criminal defendant "claims perfect self-defense, the applicable provisions of [N.C. Gen. Stat.] § 14-51.3—and, by extension, the

disqualifications provided under [N.C. Gen. Stat.] § 14-51.4—govern." *State v. McLymore*, 380 N.C. 185, 191, 868 S.E.2d 67, 73 (2022). The subsection applicable in the instant case provides that a person is justified in using deadly defensive force and has no duty to retreat from a place where he has the lawful right to be if he "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself . . . or another." N.C. Gen. Stat. § 14-51.3(a)(1). Yet this statutory right of self-defense, an affirmative defense, is not available to a person who uses defensive force while "attempting to commit, committing, or escaping after the commission of a felony." *Id.* § 14-51.4(1).

Under N.C. Gen. Stat. § 14-51.4(1), in order to bar a defendant's claim justifying his use of defensive force, "the State must prove the existence of an immediate causal nexus between the defendant's disqualifying conduct and the confrontation during which the defendant used force." *McLymore*, 380 N.C. at 197, 868 S.E.2d at 77. Stated another way, "[t]he State must introduce evidence that 'but for the defendant' attempting to commit, committing, or escaping after the commission of a felony, the confrontation resulting in injury to the victim would not have occurred." *Id.* at 197–98, 868 S.E.2d at 77 (cleaned up).

Whether "a defendant was engaged in disqualifying conduct bearing an immediate causal nexus to the circumstances giving rise to his or her use of force" is ordinarily a jury question. *Id.* at 198, 868 S.E.2d at 77.

On appeal, both the State and Defendant rely on our Supreme Court's analysis

in *State v. McLymore*, 380 N.C. 185, 868 S.E.2d 67 (2022). But Defendant's argument—that the alleged "but for," the defendant's "disqualifying conduct, . . . cannot happen after the confrontation" during which the defendant used force—rests upon an apparent misapprehension of this important precedent.

Following a physical altercation in the victim's vehicle, the *McLymore* defendant shot and killed the victim, dumped his body, and stole his car. *Id.* at 187–88, 868 S.E.2d at 70. The defendant, whose criminal record included multiple felony convictions, claimed self-defense at trial. *Id.* at 188, 868 S.E.2d at 71. The trial court granted his request for jury instructions on self-defense but delivered a limiting instruction stating that the defendant would not be

> entitled to the benefit of self-defense if he was committing the felony of possession of a firearm by a felon. . . . The State must prove beyond a reasonable doubt, among other things, that the [d]efendant did not act in self-defense, or that the [d]efendant was committing the felony of possession of a firearm by [a] felon if the [d]efendant did act in self-defense.

*Id.* (cleaned up).

The jury found the defendant guilty of first-degree murder, felonious speeding to elude arrest, and robbery with a dangerous weapon (arising from the theft of the victim's vehicle). *Id.*

On appeal, our Supreme Court addressed whether the trial court committed reversible error by charging the jury, pursuant to N.C. Gen. Stat. § 14-51.4, "that the defendant . . . could not claim self-defense to justify his use of deadly force because he

was also in violation of [N.C. Gen. Stat.] § 14-415.1, which makes it a Class G felony for an individual with a prior felony conviction to possess a firearm." *Id.* at 186, 868 S.E.2d at 70. The Supreme Court agreed with the defendant's interpretation of N.C. Gen. Stat. § 14-51.4(1), concluding that the provision "does incorporate a causal nexus requirement" and therefore, "the trial court committed an instructional error when it misstated the requirements of the felony disqualifier at [the defendant]'s trial." *Id.* at 192, 868 S.E.2d at 73.

As our Supreme Court explained, the court's instructional error denied the defendant "the opportunity to dispute the existence of a causal nexus between his violation of [N.C. Gen. Stat.] § 14-415.1 and his use of force and to assert any affirmative defenses." *Id.* at 187, 868 S.E.2d at 70. "Further, the jury was not afforded the opportunity to decide whether [the defendant]'s possession of the firearm was causally connected to the initiation of a confrontation between himself and" the victim, "which is the operative question under" N.C. Gen. Stat. § 14-51.4(1). *Id.* at 198–99, 868 S.E.2d at 77.

Despite the instructional error, the Supreme Court further concluded that the defendant could not show prejudice because the jury also convicted him of robbery with a dangerous weapon. *Id.* at 200, 868 S.E.2d at 78. To support a conviction for robbery with a dangerous weapon, "the defendant's threatened use or use of a dangerous weapon must precede or be concomitant with the taking, or be so joined by time and circumstances with the taking as to be part of one continuous transaction."

*Id.* at 199 n.3, 868 S.E.2d at 78 n.3 (citation omitted). Thus, the Supreme Court reasoned, in finding the defendant guilty of robbery with a dangerous weapon, the jury necessarily found that "there existed an immediate causal nexus between [the defendant's] felonious conduct"—robbery with a dangerous weapon—"and the confrontation during which he used assertedly defensive force"; consequently, "the felony disqualifier applie[d] to bar his claim of self-defense." *Id.* at 200, 868 S.E.2d at 78.

In the present case, Defendant's reliance on *McLymore* is misplaced. Nowhere in *McLymore* did the Supreme Court suggest that there was a specific temporal component to the felony disqualifier beyond the statutory requirement of "an immediate causal nexus." *Id.* In fact, Defendant's argument that the defendant's felonious "disqualifying conduct . . . cannot happen after the confrontation" during which he used assertedly defensive force directly contradicts *McLymore. See id.* at 187, 868 S.E.2d at 70 (recognizing that both the defendant's conviction "and the uncontroverted facts conclusively establish that [his] commission of robbery with a dangerous weapon *immediately followed the confrontation during which he used deadly force*" (emphasis added)).

Moreover, unlike in *McLymore*, here, Defendant was provided with the requisite "opportunity to dispute the existence of a causal nexus between his" disqualifying felonious conduct and "to assert any affirmative defenses." *Id.* Likewise, the jury was afforded the opportunity to determine—and necessarily found—that

there existed an immediate causal nexus between Defendant's felonious conduct and the shootings of Morrow and Bolten. *Id.* at 200, 868 S.E.2d at 78.

Therefore, the trial court did not err by delivering the felony-disqualifier limiting instruction when charging the jury on Defendant's statutory right of self-defense as to the charges of first-degree murder and attempted murder of Morrow and Bolten, respectively.

### 3. Accident

Defendant contends that the trial court committed reversible error in denying his request for jury instructions on the defense of accident with respect to the charges of 1) first-degree murder of Janet Scronce, 2) attempted murder of Tilden Hoyle, and 3) discharging a firearm within an occupied enclosure with the intent to incite fear. According to Defendant, the trial court's denial of his requested instruction on the defense of accident constitutes reversible error on these charges because Defendant's "version of events described a struggle over a gun" during which his weapon accidentally discharged, and Hoyle and Scronce were unintentionally shot. Defendant thus maintains that it was "for the jury" to determine whether he was engaged in unlawful conduct and not culpably negligent or otherwise acting with criminal intent. We disagree.

Unlike self-defense, which is an affirmative defense, the defense of accident serves "to negate the *mens rea* element of" a criminal offense. *State v. Lytton*, 319 N.C. 422, 426, 355 S.E.2d 485, 487 (1987). Consequently, where the defense of

accident applies, "[t]he burden remain[s] upon the State to prove each and every element of the crime charged beyond a reasonable doubt." *State v. Harris*, 289 N.C. 275, 279–80, 221 S.E.2d 343, 346–47 (1976) (citation omitted).

"A killing will be excused as an accident when it is unintentional and when the perpetrator, in doing the homicidal act, did so without wrongful purpose or criminal negligence while engaged in a lawful enterprise." *State v. Riddick*, 340 N.C. 338, 342, 457 S.E.2d 728, 731 (1995). "The defense of accident is triggered in factual situations where a defendant, without premeditation, intent, or culpable negligence, commits acts which bring about the death of another." *State v. Moss*, 139 N.C. App. 106, 113, 532 S.E.2d 588, 593 (cleaned up), *disc. review denied*, 353 N.C. 275, 546 S.E.2d 387 (2000).

The determination as to whether there is substantial evidence "support[ing] submission of the defense of accident to the jury" is a question of law to be resolved by the trial judge. *State v. Thompson*, 118 N.C. App. 33, 38, 454 S.E.2d 271, 274, *disc. review denied*, 340 N.C. 262, 456 S.E.2d 837 (1995). Consistent with the general rule regarding defenses, "[w]hen determining whether the evidence is sufficient to entitle a defendant to jury instructions on" the defense of accident, "courts must consider the evidence in the light most favorable to [the] defendant." *State v. Crisp*, 281 N.C. App. 127, 130, 867 S.E.2d 399, 402 (2021) (quoting *State v. Mercer*, 373 N.C. 459, 464, 838 S.E.2d 359, 363 (2020)).

Nonetheless, where "[t]he evidence relied upon by [the] defendant is

attenuated at best," it is "insufficient to warrant submission to the jury of an instruction on accident." *Thompson*, 118 N.C. App. at 37, 454 S.E.2d at 274. Similarly, "[w]here the defendant was not engaged in lawful conduct when the killing occurred, the evidence does not raise the defense of accident." *Moss*, 139 N.C. App. at 113, 532 S.E.2d at 593. Moreover, absent supporting evidence, a defendant's bare assertion that a shooting was unintentional "does not cleanse him of culpability and thus give rise to a defense of accident." *Lytton*, 319 N.C. at 426, 355 S.E.2d at 487.

After a careful and exhaustive review of the record, we conclude that the evidence, taken in the light most favorable to Defendant, did not support Defendant's requested jury instructions on the defense of accident. The trial court—properly acting within its role to determine "whether the evidence [wa]s sufficient to entitle [D]efendant to jury instructions on a defense or a mitigating factor," *Stephens*, 275 N.C. App. at 894, 853 S.E.2d at 492 (citation omitted)—concluded that Defendant was engaged in unlawful conduct and acting with criminal intent. We agree.

Viewed in the light most favorable to Defendant, the evidence clearly establishes that Defendant created the conditions that led to the shootings at Lytham Drive. First, it is undisputed that Defendant returned, armed, to the Lytham Drive house after he was repeatedly asked to leave. Defendant testified that after he was escorted out of the house, he drove around the area for approximately 15–20 minutes to allow Jennie Hurst to procure crack cocaine. Defendant claimed that Furahn Morrow had displayed a gun the second time that he ordered Defendant to leave the

Lytham Drive house, so before he returned, Defendant retrieved his own gun from his golf bag, which was stored in the trunk of his car. Armed with a loaded revolver and extra ammunition, Defendant drove back to Lytham Drive to pick up Hurst and retrieve his money. However, when he encountered Morrow and Bolten, he reasonably feared for his life.

Defendant asserts that a reasonable jury could find that under these circumstances, he was not acting unlawfully under these circumstances. We disagree.

Even in the light most favorable to Defendant, there is no reasonable explanation for Defendant's decision to return to the Lytham Drive house—armed, no less—just 15–20 minutes after multiple people told him that he was no longer welcome there. Defendant testified that his objective in returning was to retrieve Hurst and the money that he believed she owed him. But there was no evidence that Hurst wanted to see Defendant again. In fact, it was Hurst who recognized the dramatic and frightening change in Defendant, her friend of over a decade, when their seemingly minor disagreement quickly escalated into something much more serious. Deeming Defendant a threat for the "[f]irst time ever," Hurst ran away from him and hid outside for approximately 30 minutes in the early morning hours. And at her first opportunity, she urged others to order Defendant to leave. Despite multiple requests from several individuals, Defendant refused to stay away.

On appeal, Defendant identifies scant evidence—beyond his own testimony— to support his claim of accident. Although Defendant baldly asserts that "the

trajectory of the bullets, and the manner in which the bullets struck" Scronce and Hoyle also provided substantial evidence that his gun "discharged accidentally," Defendant fails to support these conclusory statements with any legal argument or citations to the record. Absent substantial evidence to support his claims, Defendant's bare arguments and self-serving testimony on subjective matters do not entitle him to jury instructions on the defense of accident. *See, e.g.*, *Lytton*, 319 N.C. at 426, 355 S.E.2d at 487 ("The fact that the defendant claims now that he did not intend the shooting does not cleanse him of culpability and thus give rise to a defense of accident."); *Thompson*, 118 N.C. App. at 37, 454 S.E.2d at 274 (recognizing that where the defendant's evidence of accident is "attenuated at best," the issue is "insufficient to warrant submission to the jury").

Nor does the (undisputed) evidence of a violent "scuffle" or "struggle" over Defendant's gun after he entered the Lytham Drive house give rise to the defense of accident in this case. Even in Defendant's telling, such "struggle" occurred only after Scronce and Hoyle were shot. *Cf. Lytton*, 319 N.C. at 425, 355 S.E.2d at 487 ("[The d]efendant points to testimony by some eyewitnesses that the shots were fired as [the] defendant and [the] decedent were struggling with each other and to his own testimony that he did not intend to fire the pistol, and argues that this testimony was sufficient to support . . . an instruction [on the defense of accident]. *We disagree.*" (emphasis added)).

"A trial judge is required to instruct the jury on the law arising from evidence

presented at trial." *State v. Brichikov*, 281 N.C. App. 408, 416, 869 S.E.2d 339, 345 (citation omitted), *aff'd*, 383 N.C. 543, 881 S.E.2d 103 (2022). In the present case, the evidence quite simply did not support Defendant's requested instructions on the defense of accident.

But even assuming, *arguendo,* that the trial court erred in declining to instruct the jury on accident, Defendant cannot demonstrate prejudice. As Defendant acknowledges, each of these three offenses—that is, first-degree murder (Scronce), attempted first-degree murder (Hoyle), and discharging a firearm within an occupied enclosure with the intent to incite fear—required proof of an *intentional shooting*. Indeed, as Defendant astutely observes:

> Here, the State was required to prove that [Defendant] intentionally fired a gun in the [house] at . . . Lytham Drive and intentionally fired the shots that killed Janet Sc[r]once and wounded Tilden Hoyle. These charges hinged on whether [Defendant] *intentionally* shot a gun inside [the house at] Lytham Drive, whether he *intentionally* shot Sc[r]once specifically intending to kill her, and whether he *intentionally* shot Hoyle intending to kill him. If his gun accidentally discharged, he would not be guilty of those three crimes.

We agree with Defendant on each of these points. And in the case before us, the jury's verdicts clearly establish that the jury considered all of the evidence— including Defendant's testimony supporting his claim of accident, notwithstanding the trial court's decision not to instruct the jury on the defense—and determined that the shootings were, in fact, intentional.

The jury's verdicts "preclude[ ] the possibility that the same jury would have accepted . . . [D]efendant's claim[s]" of accident "even if it had been given the requested instruction." *Riddick*, 340 N.C. at 344, 457 S.E.2d at 732. Thus, this argument is without merit.

**C. Double Jeopardy**

In his final argument, Defendant contends that the trial court erred when it imposed a judgment for discharging a firearm within an occupied enclosure with the intent to incite fear when he "was also convicted of murder and attempted murder based on this same shooting, in violation of double jeopardy."

Yet, as Defendant concedes, he "failed to raise this constitutional challenge in the trial court." "Constitutional questions not raised and passed on by the trial court will not ordinarily be considered on appeal." *State v. Kirkwood*, 229 N.C. App. 656, 664, 747 S.E.2d 730, 736 (citation omitted), *appeal dismissed*, 367 N.C. 277, 752 S.E.2d 487 (2013). Accordingly, Defendant "requests this Court to exercise its discretion under [N.C.R.] App. P. 2 and review the double jeopardy claim."

As our Supreme Court has consistently reiterated, "Rule 2 relates to the residual power of our appellate courts to consider, *in exceptional circumstances*, significant issues of importance in the public interest or to prevent injustice which appears manifest to the Court *and only in such instances*." *State v. Campbell*, 369 N.C. 599, 603, 799 S.E.2d 600, 602 (2017) (citation omitted). "[W]hether an appellant has demonstrated that his matter is the rare case meriting suspension of our

appellate rules is always a discretionary determination to be made on a case-by-case basis." *Id.* at 603, 799 S.E.2d at 603; *see also State v. Mulder*, 233 N.C. App. 82, 87, 755 S.E.2d 98, 101 (2014) ("The decision to review an unpreserved argument relating to double jeopardy is entirely discretionary.").

Upon review of the record, we conclude that this is not the exceptional case warranting suspension of our Appellate Rules to enable our review of a constitutional argument not previously raised or considered below. *See Campbell*, 369 N.C. at 603, 799 S.E.2d at 602. Accordingly, we decline to invoke Rule 2 to review the merits of this unpreserved issue.[3]

**D. Clerical Error**

Lastly, we discern a clerical error in the judgment entered in file number 23CR006315-590. In the judgment, Defendant's conviction for discharging a firearm within an occupied enclosure with the intent to incite fear was mistakenly recorded as a violation of N.C. Gen. Stat. § 14-34.1(b), rather than N.C. Gen. Stat. § 14-34.10. *Compare* N.C. Gen. Stat. § 14-34.1(b) (codifying the offense of discharging a firearm into occupied property, a Class D felony), *with id.* § 14-34.10 (providing that

---

[3] Although not dispositive of our decision not to invoke Rule 2 in the present case, we note that the *Jenkins* Court expressly rejected the very same constitutional argument advanced by Defendant. *See Jenkins*, __ N.C. App. at __ n.9, 920 S.E.2d at 536 n.9 (explaining that the Court's analysis of the prefatory clause of N.C. Gen. Stat. § 14-34.10 turned on principles of statutory interpretation, not double jeopardy (citing *State v. Davis*, 364 N.C. 297, 698 S.E.2d 65 (2010))). *Cf. State v. Rambert*, 341 N.C. 173, 176, 459 S.E.2d 510, 513 (1995) (concluding that there was no double-jeopardy violation where the defendant was convicted and sentenced on three counts of discharging a firearm into occupied property pursuant to N.C. Gen. Stat. § 14-34.1 based on "three distinct and, therefore, separate events").

discharging a firearm within an occupied enclosure with the intent to incite fear is a Class F felony). Crucially, the error appearing in the judgment did not affect Defendant's sentence. Moreover, both the offense and felony class listed in the judgment are correct; the only error is to the statutory section. Accordingly, we remand the judgment in file number 23CR006315-590 to the trial court for the limited purpose of correcting this clerical error. *See State v. Newsome*, 264 N.C. App. 659, 665, 828 S.E.2d 495, 500 (2019) ("When, on appeal, a clerical error is discovered in the trial court's judgment or order, it is appropriate to remand the case to the trial court for correction because of the importance that the record speak the truth." (citation omitted)).

## IV. Conclusion

As explained herein, the trial court did not err by denying Defendant's motion to dismiss the charges of 1) attempted murder with respect to Doug Bolten, or 2) discharging a firearm within an occupied enclosure with the intent to incite fear. Nor did the trial court err 1) by delivering the felony-disqualifier limiting instruction in charging the jury on Defendant's right of self-defense with respect to the shootings of Furahn Morrow and Doug Bolten; or 2) by declining to instruct the jury on the defense of accident where the evidence failed to support Defendant's requested instruction. We decline Defendant's request to invoke Rule 2 to reach his unpreserved double-jeopardy argument.

For the foregoing reasons, we conclude that Defendant received a fair trial, free

from error. However, we remand the judgment entered in file number 23CR006315-590 for the limited purpose of correcting a clerical error, as noted herein.

NO ERROR; 23CR006315-590 REMANDED FOR CORRECTION OF A CLERICAL ERROR.

Judges GRIFFIN and FLOOD concur.